GEORGE R. ARCHER AND SARAH A. ARCHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Archer v. Commissioner
Docket No. 15672-84.
United States Tax Court
T.C. Memo 1987-70; 1987 Tax Ct. Memo LEXIS 66; 53 T.C.M. (CCH) 45; T.C.M. (RIA) 87070; February 5, 1987. Anne M. McKinney, for the petitioners. Vallie C. Brooks and Howard P. Levine, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Tax Year Ended
Deficiency
December 31, 1980
$8,836.10
December 31, 1981
8,984.55
After concessions, *67 the sole issue remaining for decision is whether petitioners' farming activity constituted an "activity not engaged in for profit" within the meaning of section 183. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed herein petitioners resided in Lenoir City, Tennessee. Petitioners were married during the years in issue and filed joint returns for these years. Petitioner George R. Archer (hereinafter referred to as "petitioner") was raised in a farm-oriented family in Loudon County, Tennessee. The family raised chickens and dairy cows, and occasionally raised hogs. In high school, petitioner was an agricultural student, a member of the Future Farmers of America, and maintained beef cattle as part of a high school project. Beginning in 1954 and continuing until his retirement in 1985, petitioner was *68 a full-time employee of the Oak Ridge National Laboratory (ORNL) in Oak Ridge, Tennessee. At ORNL he was employed as a welding inspector in the Quality Assurance and Control Division. From 1968 until sometime during 1981, petitioner farmed lands located primarily in Loudon County, Tennessee, and to a lesser extent, in the adjoining county of Roane. His farming operations consisted of raising beef cattle and growing hay and corn. Petitioner began raising beef cattle in 1968 when he acquired a small pure-bred Angus herd. The animals were kept on land leased from a neighbor. Petitioner abandoned his plans to breed pure Angus cattle after several unsuccessful years of trying, realizing that he could not operate profitably in the highly competitive pure-bred cattle market. Based on his consultation with experts in the field of cattle raising and on information obtained through reading trade journals, petitioner changed his operation to a cross-breed feeder enterprise. This involved breeding Angus with Black Face cattle to obtain "Black Baldies" or "Black-White-Face" cattle, in an attempt to obtain a higher yield on the sale of his calves. At one point during his cattle raising *69 venture petitioner had about 75 head of cattle. During 1980, he held a herd of approximately 25 breeding cows, 25 to 30 calves, and one bull for a total of 50 to 60 head of cattle. Petitioner maintained various tracts of land on which he kept the cattle and where he grew hay. He leased a 30-acre tract of fenced land, located within a mile of his home, from a private individual during the early to mid 1970's. His cattle were kept in a barn on this leased property until the late 1970's when a water pollution problem forced him to move his herd. The water pollution developed when a local nursing home began dumping raw sewage into the only stream that supplied water to petitioner's cattle. The pollution caused the cattle to suffer serious health problems which resulted in the loss of at least two animals. Although petitioner brought the matter to the attention of the Loudon County Health Department, no action was ever taken to correct the situation. Petitioner also leased two tracts of land from the Tennessee Valley Authority (TVA), consisting of a total of 80 acres located about 10 miles from petitioners' home. Petitioner moved his cattle to one of these TVA leased tracts, consisting *70 of 55 acres, in 1978 as a result of the water pollution. The TVA discontinued its leasing program in 1980, forcing petitioner again to move his herd. In 1980, when the lease expired, the cattle were moved to a 110-acre tract of fenced land located in Roane County. The Roane County land was purchased by petitioners in 1979 for $45,000. It has a barn and is located approximately 21 miles from petitioners' residence. Petitioners also obtained other, smaller, unfenced tracts of land that were used for raising hay over the years: 6 acres purchased in Hardin Estates in 1962; 16 1/2 acres purchased in an estate sale in 1973 or 1974; and 3 acres in Loudon County purchased sometime after 1974. The only improvement on any of the parcels purchased by petitioners was the barn located on the Roane County tract. Petitioners resided on a two-acre lot in Loudon County from 1966 until the present. This lot was never treated as part of their farm lands. In addition to raising hay, petitioner also attempted to raise corn. His attempt was unsuccessful, however, as his first crop -- consisting of 80 to 90 acres -- was devastated by disease. In accounting for his farming operations, petitioner *71 maintained an invoice file for each company with whom he did business, together with a farm checking account which he kept separate from his personal account. [2] Petitioner reconciled his farm account bank statements with his farm account balance on a routine, monthly basis. Petitioner also maintained an account with a local farm-supply cooperative from which he received a year-end breakdown of any farm purchases made during the year. Petitioner maintained a fuel log to assist in accounting for farm truck expenses. Petitioner kept abreast of accepted farming practices. During the time of his cattle breeding operation, he subscribed to and consulted several trade journals including Tennessee Cattleman, Tennessee Farmer, and Progressive Farmer. He was also involved in various cattleman's associations including the East Tennessee Angus Association. He served on the board of directors of the Loudon County Livestock Association, was a secretary for the Smoky Mountain Feeder Calf Association, and *72 was an active participant in the local 4-H Club. During 1974-1975 he held the position of President of the Loudon County Livestock Association and was pictured in the March 1975 issue of Tennessee Stockman. Since he began his cattle breeding operation, petitioner has continued to educate himself in farming techniques through local farmers' evening classes and university courses. These courses included Beginner's Electric Welding (used in farm welding work), and an extension course in small gas engines (used to do work on farm machines such as roto-tillers, chain saws, wood splitters, etc.) for which he received three credit hours at the University of Tennessee, Agriculture Education Department. He also consulted with and followed the advice of the local Loudon County Agricultural Agent and other advisors regarding such areas as foraging crops, breeding techniques, vaccination, and fly-control practices. During the years of his involvement in beef cattle farming, petitioner devoted considerable personal time and effort to the enterprise. In the winter months, he spent 2-3 hours per day feeding the cattle in the morning and evening. At the time of the year when it was required, *73 he spent substantially more time sowing the hay and putting it up for feed. He likewise spent time checking the herd before and after calving, performing cattle worming and vaccinations, and maintaining and restoring farm equipment. Petitioners purchased a considerable amount of equipment and machinery for use on the farm. Among the items listed by petitioners in their tax returns upon which depreciation was taken are the following: Year
Property
Acquired
Cost
Mower Conditioner
1973
$2300
Tractor
1974
3142
Feed Mill and Mixer
1975
1010
Hay Baler
1978
3997
Tractor
1978
9287
Truck
1979
7786
Loader and Rake
1979
3500
Mower Conditioner
1979
1073
Disc
1979
1773
Petitioners also purchased numerous other less costly pieces of equipment such as a corn picker, tractor attachments, chain saws, plows, and trailers. In 1973, petitioner invested in a fledgling company formed, with his help, by a friend. The venture ended up being successful as the company went public in 1981, thereby realizing a profit for petitioner in excess of $160,000. Petitioners reported the following income and expenses from their farming operation on the Schedule *74 F filed with their tax returns for the taxable years 1975 through 1982: Real Estate
Total
Total
Taxes
Other
Year
Income
Expenses
Depreciation
and Interest
Expenses
Profit/Loss
1975
$5,094
$19,336
$4,262 $953 $14,121
($14,242)
1976
7,495
17,311
3,965
1,585
11,761
( 9,816) 1977
3,479
11,085
3,834
1,428
5,823
( 7,606) 1978
2,041
14,215
4,740
170  9,305
( 12,174)
1979
1,287
21,862
7,697
1,540
12,625
( 20,575)
1980
5,348
23,942
7,902
3,833
12,207
( 18,594)
1981
6,899
21,334
7,927
2,909
10,498
( 14,435)
1982
1,443
1,400
1,400
42     In 1980, petitioner's job responsibilities at ORNL began to change, requiring him to make overnight trips. These overnight assignments increased in length of time and frequency until petitioner realized that he would no longer be able to care for the cattle herd. As a result of his increased job responsibilities, petitioner decided at some point during 1980 or 1981 to completely dispose of the herd. Although petitioner ultimately disposed of the cattle, he retained his farm equipment because of his intention to return to some type *75 of farming after his retirement. Shortly after his retirement in 1985, petitioner consulted his Loudon County Agricultural Agent concerning the feasibility of starting a cattle feeding operation with the by-product of a local corn processing plant. The following table sets forth selected figures from petitioners' income tax returns for the years 1975 through 1982: 1975
1976
1977
1978
Income
Wages: George Archer
$13,704 $14,555 $16,856 $20,484 Sarah Archer
15,294 19,124 21,580 24,337 Subtotal
28,998 33,679 38,436 44,821 Interest
671 19 1,220 1,337 Dividends
662 Capital Gains
25 1,947 3,004 264 Total
29,694 35,645 42,660 47,084 Farming Loss
(14,242)
(9,816)
(7,606)
(12,174)
Adjusted Gross
[4] Income $15,296 $25,001 $34,768 $33,672 1979
1980
1981
1982
Income
Wages: George Archer
n/a
$21,733 $ 24,783 $24,210
Sarah Archer
n/a
24,034 25,433 25,469
Subtotal
51,299 45,767 [3] 53,216 49,679
Interest
947 984 2,257 8,390
Dividends
690 1,059 883 3,216
Capital Gains
4,296 3,126 62,706 9,798
Total
57,232 50,936 119,062 71,083
Farming Loss
(20,575)
(18,594)
(14,435)
42
Adjusted Gross
[4] Income $36,392 $31,167 $104,060 $55,090
*76 The tracts of land involved in petitioner's farming operation did not contain fishing streams, ponds, or any other recreational facilities. Respondent disallowed, inter alia, the claimed farm losses in excess of farm income for the 1980 and 1981 tax years. ULTIMATE FINDING OF FACT Petitioner's farming activity was an activity engaged in for profit during the taxable years in issue. OPINION The issue for decision is whether petitioner's farming activity during the years in issue constituted, under section 183, an "activity not engaged in for profit." Section 183 provides that, except as otherwise provided for in that section, taxpayers will *77 not be allowed deductions incurred in an activity "not engaged in for profit." [5] The deductions claimed by petitioners are therefore allowable in full only if petitioners' motivation in investing in the farm was to make a profit. Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). The taxpayer's objective is a question of fact to be determined from all the facts and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979). The *78 burden of proof is on the taxpayer, Golanty v. Commissioner,supra at 426, with greater weight given to objective facts than to the taxpayer's mere statements of intent. Engdahl v. Commissioner,supra at 666; sec. 1.183-2(a), Income Tax Regs.
The regulations under section 183 list the following nine factors which should normally be taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity. *79 Sec. 1.183-2(b), Income Tax Regs. These factors are not exclusive and are to be applied according to the unique facts of each case. Sec. 1.183-2(b), Income Tax Regs. Accordingly, no one factor, nor a majority of the nine factors, need be considered determinative. Golanty v. Commissioner,supra at 426-427. We are also given guidance by the Congressional purpose in enacting section 183: The legislative history surrounding section 183 indicates that one of the prime motivating factors behind its passage was Congress' desire to create an objective standard to determine whether a taxpayer was carrying on a business for purpose of realizing a profit or was instead merely attempting to create and utilize losses to offset other income. [Citation omitted; Jasionowski v. Commissioner,66 T.C. 312, 321 (1976).] Congressional concern stemmed from a recognition that "Wealthy individuals have invested in certain aspects of farm operations solely to obtain 'tax losses' -- largely bookkeeping losses -- for use to reduce their tax on other income. * * * One of the remarkable aspects of the *80 problem is pointed up by the fact that persons with large non-farm income have a remarkable propensity to lose money in the farm business." S. Rept. 91-552, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 423, 635 (Individual Views of Senator Albert Gore). See also H. Rept. 91-413, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 200, 244-245; S. Rept. 91-552, supra,1969-3 C.B. at 489-490. With this background in mind we turn to the facts before us. A review of the entire record in this case persuades us that petitioner has proven that his farming activity was an activity engaged in for profit. This is not a case where a wealthy taxpayer nonchalantly entered the farming business with the intent to produce paper losses to offset his nonfarm income. [6] Rather, here the facts reveal a taxpayer who diligently worked at his farming operation with the honest and sincere belief of making the operation profitable. His testimony in this regard was forthright, impressive, and entirely believable.That his intentions may have been excessively optimistic is not our concern. Instead, we believe that the requisite profit-motivated intent was present. With *81 this overview, we will discuss in more detail the section 183 factors that are meaningfully applicable to this case. [7]
*82 The manner in which petitioner carried on his farming activity supports his claim of profit objective. Although petitioner did not maintain formal books of account, he did keep a separate farm checking account which he reconciled monthly to his own records. He also maintained invoice files for each merchant he did business with, completed a log of expenditures for his trucking expenses, and used the yearly breakdown provided by the local farm-supply cooperative to aid in accounting for his farm purchases. Thus, we are convinced, especially when it is considered that the farm was operated as a sole proprietorship, that petitioner accurately accounted for his farm income and expenses. See Faulconer v. Commissioner,748 F.2d 890, 896 (4th Cir. 1984). It is also significant that petitioner changed his operating methods in an attempt to improve profitability. After he realized he could not compete in the highly competitive pure-bred cattle market, he changed his operation so as to adopt a cross-breed feeder enterprise. All of these facts show that the venture was carried on in a businesslike fashion. The expertise of petitioner and his advisors similarly supports *83 petitioners' position and undermines respondent's. Petitioner's background in farming began at an early age; he grew up in a family that raised chickens, hogs, and dairy cows. His farming education continued in high school where he studied agriculture, joined the Future Farmers of America, and raised beef cattle as a school project. During his farming years in Loudon County from 1968 to 1981, he read trade journals, consulted with his local County Agricultural Agent and other advisors, and continuously studied agricultural practices through farmers' evening classes and courses at the University of Tennessee Agriculture Department. Petitioner also became active in local farming associations, eventually becoming president and a member of the board of directors of the Loudon County Livestock Association, as well as secretary of the Smoky Mountain Feeder Calf Association. His level of experience and expertise in farming is well respected by the members of the farming community. For example, at trial, a Loudon County Agricultural Agent testified that petitioner's beef cattling skills were "way above average." In addition to his own expertise, petitioner occasionally relied on the *84 advice of others in running his cattle operation. As is indicated in our findings, he relied on advice in such areas as foraging crops, breeding techniques, vaccination, and fly-control practices. All of this evidence demonstrates that petitioner continuously attempted to gain additional experience and training, and that he sought and relied on advice from others when necessary. It shows that petitioner was genuinely concerned with acquiring the knowledge necessary to make his farm profitable. Turning to the amount of time expended by the taxpayer in carrying on the activity we see that petitioner devoted substantial amounts of time to the cattle operation. Although he was employed full-time during the years in issue, the record makes it clear that his personal time was spent caring for the cattle. He fed the cattle before and after he went to work -- regularly not eating his own dinner until after 11:00 p.m. or midnight. He checked the cattle before and after calving and performed cattle wormings and vaccinations. With a herd as large as 75 head and without much in the way of hired help it is apparent that his days were full. Nor can we ignore the time he spent harvesting *85 hay, his substantial investment in the farm equipment [8] or the time he spent maintaining it. As was stated by the Seventh Circuit Court of Appeals, "Common sense indicates to us that rational people do not perform hard manual labor for no reason, and if the possibility that petitioners performed these labors for pleasure is eliminated the only remaining motivation is profit." Nickerson v. Commissioner,700 F.2d 402, 407 (7th Cir. 1983). As no evidence was proffered that petitioner endured this physical labor for pleasure, this is another indicium of profit motive. [9]
The success of the taxpayer in carrying on other similar or dissimilar activities is a factor that neither supports nor detracts from petitioners' position. Petitioner argues that this factor aids his position in that he helped form a corporation that went public thereby enabling him to realize a gain on the sale of his stock in excess of $160,000. We have no doubts that these events occurred, but, we have not been presented with sufficient evidence to establish *86 that this one-time investment opportunity rose to the level of an "activity" as contemplated by the regulations. See sec. 1.183-2(b)(5), Income Tax Regs. No evidence was offered as to the time or effort expended by petitioner in developing the corporation or even as to the type of business in which the corporation was involved. Under these circumstances we are not persuaded that the limited evidence provided by petitioner supports his position. The next three factors provided in the regulations -- the taxpayer's history of income or losses with respect to the activity; the amount of occasional profits, if any, that are earned by the activity; and the taxpayer's financial status -- yield mixed results. It is true that petitioners claimed losses for seven straight years. It is also true that the losses were due, at least in part, to the disease caused by the water pollution from the nursing home and the disease affecting the corn crop -- circumstances beyond petitioner's control. See sec. 1.183-2(b)(6); Engdahl v. Commissioner,supra at 669. In any event it is clear that a history of losses is not determinative. See, e.g., Engdahl v. Commissioner,supra at 693 *87 (deductions allowed in spite of twelve straight years of losses in a horse breeding operation); Allen v. Commissioner,72 T.C. 28, 30 (1979) (11 years of losses not determinative).[10] Moreover, as we noted in an earlier case, "if losses, or even repeated losses, were the only criterion by which farming is to be judged a business, then a large proportion of the farmers of the country would be outside the pale." Riker v. Commissioner,6 B.T.A. 890, 893 (1927). See also Faulconer v. Commissioner,supra at 900 n. 12 ("farming is not the most profitable business in which one can be engaged").[11]
Further, as is set out in detail in our findings, petitioners' incomes were, with one exception -- the *88 windfall derived from the stock investment -- relatively modest over the course of the farming operation. The one remaining factor, the elements of recreation involved in the activity, is supportive of petitioner's position. The farming operation did not contain any fishing ponds or streams, or any other recreational facilities. Nor was petitioner's residence associated with the farm lands. The absence of any recreational purpose "strongly counsels in favor of finding that petitioners' prodigious efforts were directed at making a profit." Nickerson v. Commissioner,supra at 407. See also Faulconer v. Commissioner,supra at 901-902. In sum, we recognize that several of the factors in the regulations either produce mixed results or weigh against petitioners' case.These factors do not, however, provide a litmus paper test, and the ultimate issue we face is whether petitioners engaged in farming during the years before us with an actual and honest profit objective. We believe that they did. We accordingly conclude that the losses incurred in the activity during the years in issue are fully deductible. [12]
*89 To reflect the foregoing, as well as concessions, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Petitioner occasionally wrote checks on his farm checking account for personal items. However, the vast majority of the checks in this account were written for farm related items.↩
4. The subtraction of the farming loss from the total income as reported in the table does not exactly equal the adjusted gross income for these years due to the exclusion of certain minor items not relevant to our discussion.↩
3. This figure represents the amount reported in the return. The sum of $24,783 and $25,433, the amounts found on the Forms W-2 attached to the return, is $50,216. No explanation was offered for this discrepancy. ↩
5. Sec. 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩."
6. Cf. Perillo v. Commissioner,T.C. Memo. 1987-26↩. 7. Petitioner apparently has treated his claims of holding the farm equipment for appreciation and of holding the property for raising livestock as elements of a single activity, namely, farming.See Keelty v. Commissioner,T.C. Memo. 1984-173; sec. 1.183-1(d)(1), Income Tax Regs. ("Generally the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities"). Assuming that it is proper as a matter of law to take into account appreciation of the equipment as an element to be used in determining whether the requisite profit motive exists for the farm, see Engdahl v. Commissioner,72 T.C. 659, 668 n. 4 (1979); Fields v. Commissioner,T.C. Memo. 1981-550; cf. Frazier v. Commissioner,T.C. Memo. 1985-61 n. 9; Boddy v. Commissioner,T.C. Memo. 1984-156 n. 6, affd. without published opinion 756 F.2d 884↩ (11th Cir. 1985), the limited evidence in the record does not support petitioners' position. This argument is based solely on statements by petitioner at trial that he thought the farm equipment would appreciate. Petitioners presented no evidence as to which items were held for appreciation, whether there existed a market for these items, whether the items actually appreciated, or whether any of the items were sold was presented. As such, petitioner has failed to prove that the appreciation factor supports his position.
8. See Dennis v. Commissioner,T.C. Memo. 1984-4↩. 9. Cf. Perillo v. Commissioner,supra.↩
10. See also Frazier v. Commissioner,supra (farming losses over 6 years not determinative); Arrington v. Commissioner,T.C. Memo. 1983-673↩ (farming losses over 4 years not determinative). 11. It is significant that petitioner had gross receipts from the farm during each of the years 1975 through 1982. See Faulconer v. Commissioner,748 F.2d 890, 901↩ (4th Cir. 1984).
12. Although petitioner began selling the cattle at some point during 1980 or 1981, we are not convinced that the activity ceased being one engaged in for profit during those years. See Frazier v. Commissioner,supra;Dennis v. Commissioner,supra.↩