C. SAM ROBERTS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Roberts v. Commissioner
Docket No. 18905-83.
United States Tax Court
T.C. Memo 1987-182; 1987 Tax Ct. Memo LEXIS 178; 53 T.C.M. (CCH) 517; T.C.M. (RIA) 87182; April 6, 1987. Leslie Shields and John T. Buckingham, for the petitioner. John L. Hopkins, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Addition to Tax
Year
Deficiency
[1] Sec. 6653(b) 1978
$82,501.00
$41,250.50
1979
199,512.11
99,756.00 After concessions, *179 the issues that we must decide are: (1) whether petitioner received unreported income in 1978 and 1979; (2) whether petitioner's farm was an "activity not engaged in for profit" within the meaning of section 183; and (3) whether petitioner is liable for the addition to tax for civil fraud under section 6653(b) for 1978 and 1979. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Background
Petitioner was a resident of Tennessee when he filed his petition herein. He was born on November 6, 1930 and left school after completing the sixth grade. After leaving school, petitioner held various jobs. He spent the first five years working for Cas Walker Supermarkets. In 1952, at age 22, he went into business for himself. Since then he has owned and operated a number of businesses including a service station, a grocery store, a nightclub, a vending and amusement machine operation, and an illegal gambling operation. [2] During the years in issue petitioner operated a nightclub and a farm, and purchased and sold real estate. *180 When petitioner was 16, he married the daughter of Cas Walker, the owner of Cas Walker Supermarkets. He was divorced in 1948 after two years of marriage. Despite the divorce, petitioner has maintained a close relationship with Cas Walker. Following or during another marriage that ended in divorce, petitioner met Alma McDonald ("Alma") in 1967. Although they were never married, they lived together until 1983. Alma helped petitioner with his businesses during the years in issue. She ran petitioner's nightclub, prepared petitioner's financial records, and helped him with his farm. Petitioner's Federal income tax returns for the years in issue were prepared from the records she kept. Such records, however, did not reflect all of petitioner's business activities, and were thus incomplete. Petitioner's Farming Operation
Petitioner lived on a farm all his life and began farming in 1966. His farming operation during 1978 and 1979 consisted of raising cattle and growing hay to feed them. Before starting to raise cattle, he had learned about the cattle market by attending cattle auctions and talking to cattle farmers. Petitioner began expanding his farming operation in 1976 *181 by building his herd and increasing his acreage. Although he lost money in 1976, he hoped that by expanding the operation he could achieve economies of scale and earn a profit. Petitioner maintained records of his farm expenses during 1978 and 1979 and attempted to minimize his expenses by performing most of the farm work himself. He was skilled at operating farm machines and could personally operate each machine on his farm. By 1977 his herd was large enough to allow him to sell 120 head of cattle for $23,588.29. Although he worked hard on the farm, regularly working from dawn to dusk seven days a week, he was unable to make it profitable. He gave up farming in 1980 after concluding that he could not earn a profit. The reported results of petitioner's farming operation, his reported nonfarm income, and his net income reported for the years 1972 through 1979 are as follows: Nonfarm
Farm
Farm
Farm
Farm
Income
Net Income
Year
Receipts
Expenses
Depreciation
Loss
Reported
Reported
1972
($7,891.55)
($6,588.06)
($14,479.61)
($53,738.88) ($68,218.49)
1973
19,786.00
(17,554.95)
(6,866.87)
(4,635.82)
7,435.81 2,799.99 1974
93.33
(19,964.33)
(7,230.25)
(27,101.25)
38,973.31
11,872.06 1975
138.90
(28,351.98)
(10,385.93)
(38,599.01)
28,656.25
(9,942.76)
1976
123.01
(20,421.95)
(10,303.16)
(30,602.10)
27,288.44
(3,313.66)
1977
24,713.29
(40,040.55)
(9,688.77)
(25,016.03)
32,234.04
7,218.01 1978
13,874.36
(33,484.87)
(9,495.62)
(29,106.13)
50,528.13
21,422.00 1979
35,311.81
(58,969.72)
(9,126.75)
(32,784.66)
95,475.08
62,690.42 *182 Petitioner's Nightclub
Petitioner owned a nightclub during the years at issue that was managed by Alma. He worked there three nights a week after he finished his farm work. In February 1978 petitioner mortgaged the nightclub for $500,000 and used the proceeds to pay for a $500,000 debenture issued by the bank that granted the mortgage. Petitioner's ownership of the debenture was concealed by being listed on the bank's books as owned by persons other than petitioner. [3]
The $500,000 mortgage was issued on February 24, 1978, and accrued interest at an annual rate of nine percent from that date. Under the terms of the agreement, petitioner was obligated to pay principal and interest in 120 monthly installments beginning March 25, 1978. Petitioner purchased the $500,000 debenture on December 31, 1977. It paid interest quarterly beginning March 31, 1978 at an annual rate of 8.95 percent. Petitioner received the interest earned by the debenture despite the fact that he was not listed as its owner. The bank issued interest checks to the persons who were the record owners of the debenture, *183 had the record owners endorse the checks, and then sent the checks to petitioner. In 1978, petitioner received $44,750 of interest from the debenture and paid $33,195 of interest on the mortgage. He failed to report both the interest income and the interest expense on his 1978 Federal income tax return. On his 1979 return, petitioner reported both the interest he received from the debenture in 1979, and the interest he paid on the mortgage in 1979. Petitioner's Reports to Banks
Petitioner was required to provide his bank with periodic personal financial statements. He filed statements on December 11, 1978, January 28, 1980, and February 15, 1981 on which he represented that he had total "cash on hand and unrestricted in banks" of $8,000, $12,000, and $112,000 on those respective dates. The only liability reflected on the statement filed December 11, 1978 was a $35,000 note payable to a bank. The statement filed January 28, 1980 reported a total of $135,000 notes payable to banks. Respondent's Audit
Respondent audited petitioner's 1978 and 1979 Federal income tax returns. Petitioner met with Amos Greene, one of respondent's revenue agents, on September 22, 1980, and *184 supplied Greene with financial records. During the course of their meeting, Greene asked petitioner how much cash petitioner kept on hand, explaining to petitioner that cash on hand included cash on person, in safe deposit boxes, at home, and anywhere else other than in a bank account. Petitioner answered that he normally kept between $500 and $2,000 of cash on hand, and did not keep more substantial amounts of cash on hand. Petitioner also stated that he had no nontaxable sources of income in 1979. Greene reviewed the financial records presented by petitioner and determined that they did not reflect many large expenditures and were therefore inadequate to allow him to determine petitioner's income. Greene prepared a list of questions and met again with petitioner on or about October 20, 1980 to attempt to resolve the difficulties he was having in the audit. At that meeting, Greene revealed to petitioner some of the difficulties he was having in the audit and attempted to resolve them by asking petitioner the list of questions he had prepared. Greene was unable to fully resolve his difficulties at the October 20, 1980 meeting and attempted to meet again with petitioner. Petitioner *185 refused to meet with him. As Greene was unable to obtain the information necessary to complete his audit from petitioner, he was forced to recompute petitioner's income for 1978 and 1979 using the net worth method. [4] To obtain the financial information necessary to complete the net worth computation, Greene visited the Register of Deeds offices in all the counties of east Tennessee, visited the tax assessor's office in various jurisdictions, visited a number of courts, and obtained various bank records directly from banks. Greene listed no cash on hand outside of bank accounts in the net worth computation because his investigation had not uncovered evidence that the amount of cash petitioner had on hand outside of bank accounts had increased or decreased significantly during the period so as to affect the net worth computation.
*186 Using the net worth method, respondent determined that petitioner had unreported income in 1978 and 1979 of $129,396 and $293,475.58, respectively. [5] In arriving at that determination of unreported income, respondent classified petitioner's net expenses from his cattle farming operation as nondeductible expenses, and disallowed the farm depreciation, on the grounds that petitioner had not established that he engaged in farming for profit. [6]
*187 ULTIMATE FINDINGS OF FACT 1. Petitioner received unreported income in 1978 and 1979 which resulted in underpayments of taxes in each of those years. 2. Petitioner's farm was engaged in for profit in 1978 and 1979 within the meaning of section 183. 3. At least part of each such underpayment of tax was due to fraud. OPINION Deficiency
As petitioner maintained inadequate books and records, respondent was entitled to reconstruct his income by using the net worth method. Holland v. United States,348 U.S. 121 (1954); Thomas v. Commissioner,223 F.2d 83, 86 (6th Cir. 1955). Petitioner did not contest respondent's entitlement to use the net worth method, and stipulated at trial that he is contesting only three aspects of respondent's determination of his income. Petitioner asserts that respondent improperly determined: (1) his cash on hand, (2) his liabilities, and (3) that he was not engaged in farming for profit. Petitioner has the burden of proving that respondent's determinations were incorrect. Welch v. Helvering,290 U.S. 111, 115 (1933); *188 Rule 142(a). The errors asserted by petitioner bear upon the increase in net worth determined by respondent. Petitioner asserts that respondent's determination overstated the increase in his net worth during 1978 and 1979 because it excluded a cash hoard he allegedly had on hand at the beginning of 1978, and because it excluded a loan he had outstanding during 1978 and 1979. According to petitioner, he used the loan and cash he withdrew from the hoard to purchase assets that were included in respondent's net worth determination. Cash hoard - Respondent's net worth calculations allowed petitioner $374, $503, and $2,701 of cash on hand on December 31 of 1977, 1978, and 1979, respectively. Those amounts represent the balances in petitioner's checking accounts. Respondent included no cash on hand outside of bank accounts in the cash figures because petitioner had not established that he had any specific amounts of cash on hand at those dates. Although reasonable accuracy in the determination of opening net worth is of vital importance in net worth cases, Thomas v. Commissioner,supra at 89, this Court has recognized that inconsistent statements given *189 by taxpayers at various times during investigations can make the determination of cash on hand exceedingly difficult. Friedman v. Commissioner,T.C. Memo. 1968-145, affd. per curiam 421 F.2d 658 (6th Cir. 1970). Where there is evidence to support a finding that no significant cash hoard existed, but that the taxpayer maintained some constant but indeterminable amount of cash, respondent may properly choose not to include cash on hand in the net worth computation. United States v. Giacalone,574 F.2d 328, 333 (6th Cir. 1978), cert. denied 439 U.S. 834 (1978). This is because the net worth method determines income based on the change in a taxpayer's net worth during a relevant period. If a constant amount of cash is excluded at the beginning and end of the period, the exclusion has no effect on the amount of income determined by the net worth computation. United States v. Giacalone,supra at 333. Petitioner has presented three distinct versions of the amount of cash he had on hand at the dates relevant to *190 respondent's net worth computations. He testified at trial that he had $250,000, $150,000, and $100,000 of cash on hand on December 31 of 1977, 1978, and 1979, respectively. That testimony, even if accepted as true, would explain only $100,000 of the increase in petitioner's net worth in 1978, and $50,000 of the increase in his net worth in 1979. Petitioner's testimony conflicted directly with the admission he made at his September 22, 1980 interview with Revenue Agent Greene that he did not keep substantial amounts of cash on hand, and normally had only $500 to $2,000. It was also inconsistent with the cash on hand petitioner reported to banks on financial statements filed on December 11, 1978 and January 28, 1980. Petitioner reported that he had only $8,000 and $12,000, respectively, on hand on those dates. [7] Those financial statements reported that petitioner's notes payable to banks increased from $35,000 to $135,000 between those dates. This evidence of petitioner's borrowing money indicates the absence, rather than the presence, of a large accumulation of cash. Thomas v. Commissioner,supra at 88. *191 Although three persons testified at trial to the effect that petitioner dealt in large sums of cash, their testimony was vague as to the amounts of cash petitioner had at specific times. [8] None of the witnesses, including Alma who lived with petitioner during the years at issue, confirmed petitioner's testimony that he had a large cash hoard at the beginning of 1978 and, just as importantly, that he used cash from that hoard rather than cash from current income to purchase assets during 1978 and 1979. We consider it significant that petitioner's testimony as to his cash on hand conflicted with every representation he had made previously. We consider petitioner's earlier representations to be more credible than his *192 testimony at trial. At trial, petitioner was well aware of the significance of his cash on hand in respondent's net worth computation. When petitioner made his reports to his bank it was in his interest to fully state his cash on hand in order to present the best possible picture of his financial health. [9] When he made his earlier statements to Revenue Agent Greene he had no reason to be aware that they would be used to determine his income by the net worth method. We see no apparent explanation for the fact that petitioner's testimony of his cash on hand conflicted so sharply with his prior representations. *193 We conclude that petitioner has not proven that respondent erred in determining that he had no significant cash hoard. We hold that respondent's allowance of no cash on hand outside of bank accounts in his net worth computations did not cause the computations to overstate petitioner's income. Loan Liability - Respondent determined that petitioner had liabilities of $14,810, $512,194, and $462,862 on December 31 of 1977, 1978, and 1979, respectively. Those amounts do not include any loans from Cas Walker. Petitioner testified at trial that he had borrowed $75,000 from Cas Walker at some uncertain time to purchase a piece of property and that, in 1978 and 1979, he still owed the $75,000. [10] On cross examination petitioner was asked to confirm that the loan balance remained at $75,000 throughout 1978 and 1979. He replied that the balance decreased "a little bit" during 1979. We found petitioner's unsubstantiated testimony regarding the existence of the loan to be unpersuasive. Even if, arguendo, we accept the testimony as true, it does not establish that respondent's net worth computation overstated petitioner's income. A liability omitted from respondent's computation *194 causes petitioner's income to be overstated only if the liability was larger at the end of the period than it was at the beginning. [11] Petitioner testified that the liability remained at $75,000 during 1978, and was smaller at the end of 1979 than at the beginning of 1979. We conclude that petitioner has not proven that respondent erred in determining that he had no loans outstanding to Cas Walker during the years at issue. *195 Farm Expenses - Respondent classified petitioner's net expenses (in excess of receipts) from his cattle farming operation as nondeductible personal expenses on the grounds that petitioner had not established that he engaged in farming for profit. Respondent further disallowed petitioner's claimed depreciation in the farm activity. Whether the operation was engaged in for profit turns on whether petitioner had a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 644 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). Petitioner's objective is a question of fact to be determined from all the facts and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979). The burden of proof is on petitioner, Golanty v. Commissioner,supra at 426, with greater weight given *196 to objective facts than to his statements of intent. Engdahl v. Commissioner,supra at 666; sec. 1.183-2(a), Income Tax Regs.
The regulations under section 183 list the following nine factors which should normally be taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity. Sec. 1.183-2(b), Income Tax Regs. These factors are not exclusive and are to be applied according to the unique facts of each case. Sec. 1.183-2(b), Income Tax Regs. Accordingly, *197 no one factor, nor a majority of the nine factors, need be considered determinative. Golanty v. Commissioner,supra at 426-427. We are also guided by the Congressional purpose in enacting section 183: The legislative history surrounding section 183 indicates that one of the prime motivating factors behind its passage was Congress' desire to create an objective standard to determine whether a taxpayer was carrying on a business for the purpose of realizing a profit or was instead merely attempting to create and utilize losses to offset other income. [Citation omitted; Jasionowski v. Commissioner,66 T.C. 312, 321 (1976).] Congressional concern stemmed from a recognition that "Wealthy individuals have invested in certain aspects of farm operations solely to obtain 'tax losses' -- largely bookkeeping losses -- for use to reduce their tax on other income. * * * One of the remarkable aspects of the problem is pointed up by the fact that persons with large non-farm income have a remarkable propensity to lose money in the farm business." S. Rept. 91-552, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 423, 635 (Individual Views *198 of Senator Albert Gore). See also H. Rept. 91-413, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 200, 244-245; S. Rept. 91-552, supra,1969-3 C.B. at 489-490. With this background in mind we turn to the facts before us. A review of the entire record in this case persuades us that petitioner has proven that his farming activity was an activity engaged in for profit. This is not a case where a wealthy taxpayer casually entered the farming business with the intent to produce paper losses to offset his nonfarm income. [12] Rather, the facts reveal that petitioner diligently worked at his farming operation with the honest and sincere objective of making it profitable. His testimony in this regard was forthright, impressive, and entirely believable. That his intentions may have been excessively optimistic is not our concern. Instead, we believe that the requisite profit-motivated intent was present. With this overview, we will discuss in more detail the section 183 factors that are relevant to this case. The manner in which petitioner carried on his farming activity supports *199 his claim of profit objective. Petitioner was not content to farm unprofitably. He instead expanded the size of his herd and the acreage on which he grew hay in an attempt to achieve economies of scale and earn a profit. He maintained records of his farm expenses and attempted to minimize his expenses by performing most of the farm work himself. He gave up farming once it became apparent that he would be unable to succeed in earning a profit. The expertise of petitioner similarly supports his position that he carried on the cattle farming operation for a profit. Petitioner is not an unskilled novice who began farming without adequate preparation. Petitioner had been born and raised on a farm, and began farming in 1966. Before attempting to raise cattle in 1976, he had attended cattle auctions and talked to other cattle farmers to become familiar with the cattle market. His level of farming expertise is illustrated by the fact that he could personally operate each machine on his farm. The amount of time petitioner worked on his farm also supports his position that he operated it for profit. Petitioner's testimony that he worked on his farm seven days a week, from dawn to *200 dusk, was corroborated by the testimony of two other witnesses. One of the witnesses, in describing petitioner's work habits, drew a vivid image of the hard manual labor petitioner invested in the farm by testifying that "at the end of the day he's as dirty as all the men put together and he works harder than his men that work for him." As was stated by the Seventh Circuit Court of Appeals, "Common sense indicates to us that rational people do not perform hard manual labor for no reason, and if the possibility that petitioners performed these labors for pleasure is eliminated the only remaining motivation is profit." Nickerson v. Commissioner,700 F.2d 402, 407 (7th Cir. 1983). As there is no evidence that petitioner endured this physical labor for pleasure, the amount of time petitioner worked on his farm indicates he had a profit motive. Archer v. Commissioner,T.C. Memo. 1987-70. We accord the next five factors provided in the regulations -- the expectation that the assets used in the activity may appreciate in value; the success of petitioner in carrying on other similar or dissimilar activities; petitioner's history of income or losses with *201 respect to the activity; the amount of occasional profits, if any, that are earned by the activity; and the financial status of the taxpayer -- little weight in our analysis as we conclude that they neither support nor detract from petitioner's position. Although petitioner dealt in land for profit, there was no evidence presented that he expected either the land he purchased for his farming or any of the other assets he used in the farming operation to appreciate in value. Similarly, with respect to the success of petitioner in carrying on other activities, we do not find significant the fact that petitioner has established a background as an entrepreneur by operating a succession of varied businesses. His background does not preclude the possibility that he operated the farm as a hobby. Although the history of losses from petitioner's farm operation is relevant to the determination of whether he actually had the objective to make a profit from the farm, the courts have consistently held that a history of consistent losses is not determinative of whether a farm is operated for profit. See, e.g., Engdahl v. Commissioner,supra at 669 (deductions allowed despite *202 12 straight years of losses in a horse breeding operation); Allen v. Commissioner,supra at 30 (11 years of losses not determinative).[13] Moreover, we have long recognized that "if losses, or even repeated losses, were the only criterion by which farming is to be judged a business, then a large proportion of the farmers of the country would be outside the pale." Riker v. Commissioner,6 B.T.A. 890, 893 (1927). See also Faulconer v. Commissioner,748 F.2d 890, 900 n. 12 (4th Cir. 1984) ("farming is not the most profitable business in which one can be engaged"). In this case petitioner's history of losses must be considered in conjunction with the fact that he was expanding his operations in an attempt to earn a profit. This is also not a case in which a taxpayer has obviously used farm losses to offset large amounts of income from other sources. Considering the amounts of income petitioner reported in most years from other sources, we conclude that his use of farming losses to offset that income is a neutral factor. *203 The final factor, the elements of personal pleasure involved in the activity, supports petitioner's position that he operated his farm for profit. The evidence establishes that petitioner worked hard on the farm. There is no evidence that he performed the hard work for pleasure. Having applied the nine factors listed under section 183 to the facts of this case, we conclude that they support petitioner's position that he operated his farm for profit. In sum, we hold that the only error petitioner has demonstrated in respondent's determination of petitioner's unreported income for 1978 and 1979 was respondent's treatment of petitioner's farm expenses as nondeductible expenses. We correct respondent's determination as follows: 1978
1979
Unreported Income Determined by
Respondent
$129,396.00 $293,475.58 Deductible Farm Expenses
[14] and Depreciation (25,935.00)
(30,372.50)
Corrected Unreported Income
$103,461.00 $263,103.08 *204 Civil Fraud
Having sustained respondent's determinations that petitioner received unreported income to the extent of $103,461 and $263,103.08 in 1978 and 1979, respectively, we must decide whether his failure to report that income was due to fraud. Fraud is established if it is shown that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). It may, however, be proven by circumstantial evidence as direct proof of a taxpayer's *205 intent is often not available. Moore v. Commissioner,619 F.2d 619 (6th Cir. 1980); Rogers v. Commissioner,111 F.2d 987, 989 (6th Cir. 1940). The taxpayer's entire course of conduct may be examined in order to determine whether the fraudulent intent is present. Korecky v. Commissioner,781 F.2d 1566, 1568 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63; Stone v. Commissioner,56 T.C. 213, 224 (1971). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Civil fraud need not, however, be proven by respondent "beyond a reasonable doubt." Webb v. Commissioner,394 F.2d 366, 380 (5th Cir. 1968), affg. T.C. Memo. 1966-81. It is unnecessary for respondent to prove the exact portion of the income that was fraudulently unreported, as section 6653(b) for the years at issue applies to each year's entire deficiency if any portion of it was due to fraud. Drybrough v. Commissioner,238 F.2d 735, 740 (6th Cir. 1956), affg. 23 T.C. 1105 (1955); Smith v. Commissioner,32 T.C. 985, 987 (1959). *206 After considering petitioner's course of conduct and the entire record, we hold that respondent has met his burden of proving fraud on the part of petitioner by clear and convincing evidence. Our holding that petitioner's underreporting of income was due to fraud is based on the presence of a number of indicia of fraud that, considered together, constitute clear and convincing evidence of fraud. A discussion of those indicia follows. Failure to report substantial amounts of income over a number of successive years is persuasive evidence of fraud. Kurnick v. Commissioner,232 F.2d 678, 681 (6th Cir. 1956); Rogers v. Commissioner,supra at 989. We have concluded that petitioner failed to report $103,461 and $263,103.08 of income in 1978 and 1979, years in which he reported only $21,422 and $62,690.42 of income, respectively. We consider petitioner's failure to report amounts of income that are large in relation to the amounts of income that he reported in those years to be evidence of fraud. [15]
*207 Petitioner's failure to keep adequate books and records, and his failure to meet with respondent following the meeting he attended on October 20, 1980, forced respondent to resort to a burdensome and time consuming indirect method of recomputing his income. Petitioner's failure to keep adequate books and records, and his failure to cooperate with respondent's investigation, are additional indicia of fraud. Solomon v. Commissioner,732 F.2d 1459, 1461-1462 (6th Cir. 1984); Marcus v. Commissioner,70 T.C. 562, 578 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Although we consider petitioner's failure to report substantial amounts of income in 1978 and 1979, his failure to keep adequate books and records, and his failure to cooperate fully with respondent's investigation to constitute evidence of fraud, an additional indicia of fraud is present. In 1978, petitioner concealed his ownership of a $500,000 debenture that he owned but that was held in the name of third party nominees. He further failed to report the income from the debenture despite the fact that it was paid to him. [16] Concealment of assets *208 and income has long been held to constitute a badge of fraud. Spies v. United States,317 U.S. 492, 494 (1943); Solomon v. Commissioner,supra at 1462; Moore v. Commissioner,supra at 619. In sum, the record clearly and convincingly evidences that petitioner fraudulently underreported his 1978 and 1979 income. We hold that respondent properly determined that petitioner is liable for the addition to tax for civil fraud provided by section 6653(b). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Petitioner has been convicted twice of professional gambling, first in November 1975 and then in January 1977.↩
3. The debenture was not recorded as owned by petitioner until September 27, 1979.↩
4. Under the net worth method, a taxpayer's income is determined to be the amount by which his year-end net worth exceeds his net worth at the beginning of the year. The result is then reduced by the part of the increase in net worth that is due to nontaxable sources, and is increased by nondeductible personal expenses. United States v. Giacalone,574 F.2d 328, 330 (6th Cir. 1978), cert. denied 439 U.S. 834↩ (1978).
5. Greene determined the unreported income as follows: ↩
1978
1979
Increase in Net Worth
During Year
$ 83,847.00 $242,417.00 Plus Nondeductible
Expenses
66,971.00 113,749.00 Less Nontaxable Income
(0)
(0)
Income Determined by Respondent
150,818.00 356,166.00 Less Income Reported
by Petitioner
(21,422.00)
(62,690.42)
Unreported Income
Determined
$129,396.00 $293,475.58 6. Petitioner claimed $9,495.62 and $9,126.75 of farm depreciation on his 1978 and 1979 returns, respectively. Respondent disallowed $3,170.62 and $3,170.25 of those amounts on the grounds that petitioner did not own the property on which the depreciation was claimed. Respondent did not allow the remaining amounts of depreciation, $6,325 and $5,956.50, respectively, as adjustments to the value of petitioner's farm property in the net worth computation on the grounds that the farm was not engaged in for profit. Respondent adjusted petitioner's 1979 farm receipts to $34,553 from the $35,311.81 that had been reported on petitioner's 1979 return, and included $19,610 and $24,416 of net farm expenses in the $66,971 and $113,749 of nondeductible expenses that he determined for 1978 and 1979, respectively. These net amounts of farm expenses were determined as follows: 1978
1979
Farm Expenses
$33,484 $58,969 Less Farm Receipts
(13,874)
(34,553)
Net Farm Expenses
$19,610 $24,416 The determination that the farm was not operated for profit increased petitioner's unreported income determined by the net worth method by $25,935 and $30,372.50 in 1978 and 1979 as follows: ↩
1978
1979
Depreciation Expense Not Allowed
as Reduction to Net Worth
$ 6,325.00
$ 5,956.50
Farm Expense Treated as
Nondeductible
19,610.00
24,416.00
Unreported Income From Farm
$25,935.00
$30,372.50
7. Respondent was entitled to rely on petitioner's admissions and reports to banks to determine petitioner's beginning cash balance. See Epstein v. United States,246 F.2d 563, 569-570 (6th Cir. 1957), cert. denied 355 U.S. 868 (1957). This is therefore not a case such as Thomas v. Commissioner,223 F.2d 83↩ (6th Cir. 1955), in which respondent's determination of petitioner's cash balance was arbitrary and without foundation.
8. Henry T. Ogle, an attorney who had known petitioner since 1977, testified that petitioner always carried a large roll of money and that he once saw petitioner with over $100,000 in his car. Glenn O'Dell, a real estate agent who had known petitioner for 20 years, testified that petitioner paid $100,000 cash for a property in 1978. Alma testified that petitioner kept large amounts of cash on his person, in his car, at his home, and in his safe deposit box.↩
9. Petitioner testified that he deliberately understated his cash on hand on the statements he made to his bank to avoid being robbed. We consider this aspect of his testimony to be unreliable. The testimony of petitioner's own witnesses established that he was unafraid to carry and display large sums of cash. Further, the line on which petitioner reported his cash reads "Cash on hand and unrestricted in banks." As the line included cash in banks, petitioner was not revealing the amount of cash he kept at home by reporting it on that line. His testimony that he was afraid to report a larger amount of cash to his bank is inconsistent with the fact that he reported $112,000 of cash on hand on his statement made on February 15, 1981. Petitioner's explanation of the $100,000 increase over the $12,000 he reported one year earlier was that he had received $100,000 from the sale of a farm in the interim. This indicates to us that petitioner was unafraid to fully report increases when they occurred.↩
10. Petitioner testified that the loan was evidenced by a note, but did not place a copy of the note into evidence. In view of petitioner's self admitted close relationship with Cas Walker, it appears that petitioner could have obtained a copy of the note had he desired to do so. We have long recognized that it is proper to draw an adverse inference from a party's failure to produce evidence that is available to them. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947). Petitioner's failure to produce a copy of the alleged note at trial is one of the reasons that we conclude that petitioner has failed to prove that the loan actually existed.
11. As the net worth method of recomputing income determines a taxpayer's income based on the change in his net worth, the exclusion of an equal amount of liability from the net worth computation at the beginning and end of the period has no effect on petitioner's income. If, as was indicated by petitioner's testimony, a smaller liability was excluded at the end of the period than at the beginning of the period, the exclusion caused petitioner's income to be understated.↩
12. Cf. Perillo v. Commissioner,T.C. Memo. 1987-26↩.
13. See also Frazier v. Commissioner,T.C. Memo. 1985-61 (farming losses over six years not determinative); Arrington v. Commissioner,T.C. Memo. 1983-673↩ (farming losses over four years not determinative).
14. We do not disturb respondent's disallowance of $3,170.62 and $3,170.25 of depreciation for 1978 and 1979, respectively, on the grounds that petitioner did not own the assets involved; petitioner offered no proof to the contrary.↩
15. As we discussed, supra,↩ we did not believe petitioner's testimony that he had a cash hoard of $250,000 at the beginning of 1978 which decreased to $100,000 at the end of 1979. Even if we had accepted petitioner's testimony regarding the cash hoard, it explains only $100,000 of the unreported income in 1978, and $50,000 of the unreported income in 1979. The remaining amounts of unreported income -- $3,461 for 1978, and $213,103.08 for 1979 -- would continue to total more than 250 percent of the income petitioner reported in those years. As we also discussed, petitioner's testimony that he had loans outstanding from Cas Walker would not reduce his unreported income computed under the net worth method even if true. In sum, even if we had accepted as true all of petitioner's testimony, which we did not, there would remain large amounts of unreported income for both of the years in issue, which petitioner did not dispute.
16. Petitioner failed to report $33,195 of interest expense, in addition to the $44,750 of interest income. The net result was that petitioner failed to report $11,555 more interest income than the interest expense he incurred.↩