LAWRENCE T. HOYLE, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hoyle v. Commissioner
Docket No. 30432-91
United States Tax Court
T.C. Memo 1994-592; 1994 Tax Ct. Memo LEXIS 600; 68 T.C.M. (CCH) 1321; December 5, 1994, Filed *600 For petitioner: H. Robert Fiebach and Dennis L. Cohen. For respondent: Ruth M. Spadaro. TANNENWALD
TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income tax: Additions to Tax Under I.R.C.[1]
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
6661
1978
$ 42,567.50
$ 2,128.00
--
--  --  1979
56,584.60
2,829.00
--
--  --  1980
71,398.00
3,570.00
--
--  --  1981
68,551.00
3,428.00
[1]
$ 1,270.00
--  1982
29,939.00
1,497.00
[1]
--  --  1983
46,696.00
2,335.00
[1]
--  $ 6,980.00
1984
47,139.00
2,357.00
[1]
--  --  1985
63,241.00
3,162.00
[1]
--  --  Certain issues *601 have been severed and are presently before us for decision. These are: (1) Whether all, none, or a portion of petitioner's farming activities constituted activities engaged in for profit within the meaning of section 183(a); (2) whether petitioner's cost basis in certain grain storage bins is $ 48,117 or $ 50,617; (3) whether the tax return for 1978 filed in the name of petitioner and his wife was a joint tax return; and (4) whether petitioner is liable for additions to tax for negligence or intentional disregard of rules and regulations. While petitioner has conceded certain other adjustments, including increased interest pursuant to section 6621 for the 1982 taxable year, other issues remain. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by reference. Petitioner resided in Philadelphia, Pennsylvania, at the time the petition was filed. Petitioner was raised within the city limits of Greensboro, North Carolina. As a child, he worked on profitable farms owned by his father, two uncles, and a client of his father. He also learned some of the economics of farming when working *602 over the years on an uncle's farm in eastern North Carolina. After graduating from law school in 1965, he assisted a cousin in evaluating whether or not to go into the grain business. Petitioner served in the Marine Corps from 1960 to 1962. Thereafter he was an associate with the Philadelphia law firm of Schnader, Harrison, Segal & Lewis. From 1971 to 1974, he served as Assistant Attorney General in the Commonwealth of Pennsylvania and then as Chairman of the Pennsylvania Crime Commission. In 1974, he returned to the Schnader firm as a partner where he remained through 1984. During 1985, he left to form a new firm, Hoyle, Morris & Kerr, where he is the managing partner. Beginning in 1970, petitioner contemplated leaving the practice of law to become a farmer. In 1972, while working in government, he looked at farms in Lancaster, Pennsylvania, but found them too expensive for his resources. In 1975, while back in private practice, he began looking for a farm in the Chesapeake area of Maryland. At this point in time, he desired to purchase a farm to obtain a supplemental income in order to enable him to return to public service. Petitioner spent over a year looking at dozens *603 of farms in the Chesapeake area before purchasing Waverly-on-Chester (Waverly) in April 1977. He was aided in his search by real estate agents and the Agricultural Extension Service. An uncle also aided him in his search for a farm and continued to give advice while petitioner held the farm. Petitioner initially believed Waverly would be too expensive. However, the owner of adjoining property offered a loan of $ 100,000 to petitioner to ensure the property would not be sold to a party that would develop the property for residential homes. Petitioner paid $ 943,887 for Waverly, of which $ 692,000 came from a recourse mortgage from the Federal Land Bank of Baltimore, $ 100,000 on a recourse second mortgage from the adjoining land owner, and the rest from petitioner's own resources. [2] Closing costs were approximately $ 60,000. *604 Waverly consists of 392 acres. It lies in Queen Anne's County, Maryland. It contains approximately 1.75 miles of water frontage on the Chester River and Tilghman Creek. During the years in issue, a main house, a 2-car detached garage, 3 tenant houses, a small brick building, a horse barn, a milk house, an implement shed, a log cabin, and a boat house were located on the property. Waverly is approximately 100 miles, a 2-hour driving distance, from petitioner's home in Philadelphia, Pennsylvania. Petitioner believed Waverly was close enough for him to do hands-on management, which he believed was necessary to make the farm run successfully. At the time of purchase, the "tillage acreage" consisted of about 270 acres. Petitioner felt that, when he purchased the property, with advice from his uncle, he could add to this amount by converting some marginal areas of land. Petitioner succeeded in putting some marginal areas into production, but the amount was approximately offset by converting some land into use for livestock. At the time of purchase, petitioner believed he could operate the farm profitably, based on the location of the farm near major population centers, and his *605 plans to introduce more efficient farming practices, to rotate crops, to fire the existing farm manager and take over the management role, to add livestock, to put more land into production, to add a hunting operation, and to replace the existing farmer with a younger and more energetic farmer. Petitioner spoke about these plans with his uncle and the Maryland Agricultural Extension Service. Petitioner believed that the ability to earn a profit depended on handling the "land costs", i.e., interest on the mortgage and depreciation and taxes. He believed that, exclusive of land costs, the farm could produce profits of several hundred thousand dollars per year if managed correctly. However, he did not prepare any detailed projections, or any sort of feasibility report, but he did make some notes in this regard. Petitioner did obtain financial information from the sellers of Waverly and learned that they were making an operating profit and that, for a number of years, they had not had a mortgage with its accompanying interest expenses. Petitioner retained an accounting firm that had special expertise in farm accounting when he was contemplating the purchase of Waverly. Upon purchase, *606 the accounting firm established a bookkeeping system for the farm, including a cash receipts journal and a general ledger maintained on a computer system. The accounting firm prepared a Schedule F for petitioner each year, which it forwarded to another of petitioner's accountants to be incorporated into petitioner's Federal tax returns. Three or four times a year, petitioner would correspond with the accounting firm regarding accounting or tax treatment of particular items. The daily recordkeeping was done by petitioner's secretary at his law firm. A separate checking account was established for each activity undertaken at Waverly. The actual labor of farming was performed by a sharecropper farmer under an agreement, pursuant to which petitioner supplied the land, the farmer supplied the labor, and they split all income and expenses equally. Petitioner released the existing farm manager to reduce expenses and assumed the management role. After petitioner purchased Waverly, he replaced the existing farmer, as soon as his agreement ended, with a new farmer. Petitioner felt the new farmer would be more receptive to new ideas and one he felt would produce better crop yields. *607 The new farmer works approximately 3,000 acres in total, including the 270 acres on petitioner's farm. At Waverly, petitioner introduced the cultivation of soybeans. Soybeans were rotated with corn to reduce fertilizer expenses and to improve crop yield. Petitioner instructed the farmer to use narrower spaces between rows of grain in order to improve crop yield. The farmer adopted these techniques on other land on which he farmed. Petitioner, in consultation with the sharecropper farmer, made decisions regarding crops to be grown, conservation practices, fertilizer and liming, and similar issues. With a view to increasing farm profitability, petitioner, in consultation with the farmer, made decisions regarding the marketing and sale of crops. In 1979, petitioner purchased grain storage bins to enable petitioner to store his crops at times when grain prices were low. Petitioner would also buy crops of other farmers which he stored in the grain bins and then sold when grain prices rose, typically in the spring. Petitioner engaged in several soil conservation and erosion abatement measures. These included the construction of ditches, waterways, grass strips, a detention pond *608 and a rip-rap project. Petitioner received advice on these undertakings from State and Federal agencies and from his farmer. Petitioner succeeded in getting the State of Maryland to assist in a project to abate land erosion. This involved going to meetings with State officials and finding contractors to bid on the project, which required petitioner to take time off from his legal practice. The previous owner of Waverly had leased hunting rights to the property for approximately $ 1,500 per annum. In 1977, petitioner terminated the lease and commenced a hunting operation. He hired an experienced guide, advertised the operation in magazines and newspapers, printed and distributed brochures, and rented hunting rights from neighboring property owners. He had problems with hunting guides that led him to hire a commercial operator to run the hunting operation for a few years. In 1984 and 1985, petitioner leased the hunting rights for a flat fee. His costs remained nominal. In 1982, petitioner began a horse operation, which included the retaining of a horse trainer. Improvements were made to an existing barn in order to board horses. Petitioner bought and sold horses until he *609 lost his horse trainer in 1985. Petitioner's 1983, 1984, and 1985 tax returns reflect transactions involving livestock (which may have included cattle as well as horses). In 1983, petitioner's Schedule F reflected income from horse boarding in the amount of $ 1,065, of which $ 794 was for the boarding of petitioner's daughter's horse. In 1984, petitioner's income from horse boarding was $ 2,338, of which $ 781 was for boarding of his daughter's horse and $ 962 represented boarding fees paid by the same neighbor who had previously loaned petitioner money for the purchase of Waverly. There were three tenant houses on Waverly, which at all times were held for rent. Improvements (stoves) costing $ 341 and $ 300 were made to the tenant houses in 1977 and 1980 respectively. After 1990, more extensive improvements were made. Rental income is listed below. Other sources of gross income were sales of raspberries, a crabbing venture, and participation in set-aside and other agricultural programs. Petitioner would bring his children with him to spend the weekend at Waverly whenever he had custody. Petitioner's daughter once spent a month at Waverly during the summer. At Waverly, his *610 daughter rode horses, including one she owned and boarded at Waverly. Petitioner's son sailed at Waverly. Petitioner hunted at Waverly, sometimes with his son and/or his farmer, although most of his recreational hunting was done with relatives in North Carolina. Petitioner entertained clients of his law practice at Waverly at least four or five times a year. Petitioner used the main house to sleep, eat, and do both farm work and work from his legal practice. He, his children, and his guests stayed in the main house when they were at Waverly. Petitioner installed air conditioning in the main house in 1985 and made other improvements in 1990 and 1991. Petitioner spent 500 to 700 hours per year on farm-related activity. This activity included oversight and managerial type work at the farm, daily conversations with the farmer, regular tracking of the commodity markets, contact with various government agencies, occasionally acting as a hunting guide. Petitioner met with his farmer 30 to 40 times a year and had phone contact 100 to 200 times a year. Petitioner spent most weekends working at Waverly. In 1987, petitioner began to develop thoroughbred horse racing and game-bird *611 breeding operations. In 1985, he first realized he would have to undertake activities such as these to make the farm profitable. These operations required significant expenditures compared to petitioner's previous annual expenses. New facilities were added including barns, incubators, pens, and sheds for the bird operation and an equipment shed, paddocks, fencing and track for the horse operation. Petitioner believed the game-bird breeding and horse-racing operations, coupled with the other agricultural undertakings, would enable petitioner to recoup all his prior losses. For 1988 to 1992, petitioner's revenues from these two operations were as follows: Game Bird
Year
Sales
Horse Winnings
1988
$ 9,136  $ 4,000  1989
58,316
36,163
1990
[1]  89,076
1991
132,880
143,635
1992
120,921
282,354
As of August 1985, petitioner's farm was appraised, in the course of divorce proceedings, at a value of $ 1,860,000. Petitioner believed the value exceeded that figure. Respondent's appraiser has valued the property at $ 1,602,000 *612 as of the same date. The parties have stipulated to a value of $ 1,731,000 as of August 24, 1985. [3]
Petitioner believed Waverly would increase in value from adding and improving existing structures, and because of the soil conservation and abatement projects undertaken. During the years in issue, petitioner listed his occupation on his tax returns as "lawyer/farmer". Petitioner's gross income from various farm activities and expenses related thereto for 1977 through 1992 are as follows: INCOME
Tenant
Grain House Horse Horse Year
Sales Hunting
Rentals [1] Sales Winnings
1977
$ 22,498 $ 684  $ 2,595  --   --  1978
34,946
7,554
4,015
--   --  1979
--
5,796
4,135
--   --  1980
73,964
5,518
5,360
--   --  1981
33,074
3,282
4,883
--   --  1982
118,990
3,979
5,740
--   --  1983
80,776
7,675
10,625
$ 18,000 --  1984
34,859
12,500
5,850
10,850 --  1985
36,674
12,500
7,450
(8,024)
--  1986
54,297
[3] --  8,256
--   --  1987
32,631
--  7,335
--   --  1988
20,988
--  7,245
--   4,000
1989
47,918
--  8,138
--   36,163
1990
104,721
--  8,913
--   89,076
1991
46,734
--  7,228
--   143,635
1992
31,741
--  10,008
1,000 282,354
$ 774,811
$ 59,488
$ 107,776
$ 21,826 $ 555,228
*613 INCOME
Game Total
Bird Misc.
Gross
Year
Sales
[2] Income Income 1977
--  121
$ 25,898   1978
--  2
46,517
1979
--  1,733
11,664
1980
--  1,490
86,332
1981
--  1,579
42,818
1982
--  1,267
129,976
1983
--  2,238
119,314
1984
--  3,450
67,509
1985
--  1,598
50,198
1986
--  47,805
110,358
1987
--  2,535
42,501
1988
9,136
9,114
50,483
1989
58,316
1,130
151,665
1990
[4] --  4,060
206,770
1991
132,880
7,291
337,768
1992
120,921
24,235
470,259
$ 321,253
$ 109,648
$ 1,950,030
EXPENSES
LAND COSTS
Soil
Year
Interest Depreciation
Conservation
Taxes 1977
$ 49,020   $ 10,719 --  $ 2,530 1978
66,237
11,730
--  4,256
1979
74,365
11,730
--  3,578
1980
90,318
11,730
$ 18,491 3,930
1981
97,196
11,730
8,349
4,314
1982
36,599
11,730
29,747
3,846
1983
167,609
11,730
20,194
4,894
1984
90,972
11,730
3,664
4,680
1985
97,359
11,730
2,952
5,877
1986
85,306
11,730
2,925
5,836
1987
56,010
11,730
2,222
5,580
1988
41,723
11,730
2,622
5,481
1989
28,035
11,730
2,222
4,721
1990
10,060
11,730
2,222
5,946
1991
13,122
11,730
22,615
5,246
1992
919
11,730
9,301
5,355
$ 1,004,850
$ 186,669
$ 127,526
$ 76,070
*614 EXPENSES
Total
Operational
Land & Other
TotalSchedule F Year
Costs
Expenses ExpensesLoss  1977
$ 62,269   $ 21,324   $ 83,593   $ 57,695   1978
82,223
37,773
119,996
73,479
1979
89,673
65,565
155,238
143,754
1980
124,469
107,341
231,810
145,478
1981
121,589
76,681
198,270
155,452
1982
81,922
71,313
153,235
23,259
1983
204,427
175,311
379,738
[1] 260,424
1984
111,046
118,295
229,341
161,832
1985
117,918
89,546
207,464
157,266
1986
105,797
135,178
240,975
130,617
1987
75,542
122,332
197,874
155,373
1988
61,556
279,232
340,788
290,305
1989
46,708
353,896
400,604
248,939
1990
29,958
357,844
387,802
181,032
1991
52,713
444,587
497,300
159,533
1992
27,305
501,987
529,292
59,033
$ 1,395,115
$ 2,958,205
$ 4,353,320
$ 2,403,471
During the years in issue, petitioner had income from his law practice and interest and dividend income as follows: Year
Non-farm Income
1978
$ 113,258
1979
110,648
1980
150,001
1981
394,654
1982
417,167
1983
406,382
1984
412,805
1985
[1] 804,549
*615 OPINION I. SECTION 183 Section 183(a) provides that if an activity is not engaged in for profit, "no deduction attributable to such activity shall be allowed", except as otherwise provided for in section 183(b). [4] An "activity not engaged in for profit" is defined as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Sec. 183(c). A. A Single Activity
At the outset, we find that petitioner's activities at Waverly, including the holding of the property to benefit from its appreciation, *616 are all part of a single activity for purposes of section 183. It is clear each of petitioner's operational activities were organizationally and economically interrelated. Sec. 1.183-1 (d)(1), Income Tax Regs.[5] *617 Farming, hunting, crabbing, riding lessons, horse boarding, game-bird breeding, and thoroughbred horse racing occurred at one location and were all part of petitioner's various efforts to find sources of revenue on his farm. [6] The same accountant maintained tax records for all of the Waverly activities. The mere use of different checking accounts for each activity does not require us to treat each activity separately and represents only a normal procedure for enabling petitioner readily to allocate income and expenses to the various aspects of a single activity.
Petitioner maintains that the holding of the property and the operational activities are also a single activity, in which case the appreciation in value of the land may be used to show the activity was undertaken for profit. A characterization as one activity will also cause land holding costs, including depreciation and interest expenses, to add to the history of losses of the activity with respect to section 1.183-2(b)(6), Income Tax Regs.
Respondent contends that, based on a literal reading of the regulation, the farming and holding of the land are separate activities unless petitioner purchased and held the land with the intent to profit from its appreciation, engages in farming on the land, and the farming reduces the net cost of carrying the land. We disagree. Respondent's test applies only "Where land is purchased or held primarily with the *618 intent to profit from increase in its value". Sec. 1.183-1(d)(1), Income Tax Regs. (emphasis added). [7] *619 If the taxpayer's primary intent is not to profit from appreciation of the land, then the general rule of the regulation applies in determining whether there is a single activity. In the instant case, it is undisputed that petitioner's primary intent was not to benefit from appreciation, but to operate a farm. See Engdahl v. Commissioner, 72 T.C. 659, 668 n.4 (1979). [8] Petitioner's characterization of the farming and holding of the land as a single activity is reasonable.
B. Facts and Circumstances Relating to the Farm Activity
An activity is engaged in for profit if the taxpayer has an "actual and honest objective of making a profit". Keanini v. Commissioner, 94 T.C. 41, 46 (1990) (quoting Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983)). Although the expectation need not be reasonable, a bona fide profit objective must exist. Keanini v. Commissioner, supra at 46; Dreicer v. Commissioner, supra; Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); *620 sec. 1.183-2(a), Income Tax Regs. Profit in this context means economic profit, independent of tax savings. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990). Whether petitioner engaged in his farm activity with the requisite profit objective is a question of fact to be determined from all the facts and circumstances, keeping in mind that petitioner has the burden of proving the requisite intention. Keanini v. Commissioner, supra at 46; Golanty v. Commissioner, 72 T.C. at 426. Before considering the nonexclusive list of specific factors, set forth in section 1.183-2(b), Income Tax Regs., to be taken into account in determining whether an activity is engaged in for profit, certain general observations are in order. As might be expected, each party has presented an overblown picture of the merits of that party's case and the deficiencies in the other party's position. Thus, petitioner consistently uses descriptions of petitioner's motives and activities which expand the content of the record beyond its fair limits. Similarly, *621 respondent seeks to denigrate the record by asking us in effect to disregard petitioner's testimony in its entirety because it is "self-serving". We decline to accept the specifics of either party's view of this case. [9] Rather, we will make our own evaluation of the record as a whole, in light of the fact that, to a large degree, it consists of testimony of witnesses whom we saw and heard. In so doing, we reject petitioner's position that the results of the Waverly operations in years subsequent to the last year before us should not be taken into account. To be sure, they are not direct evidence on the issue before us, but those results may properly be considered in judging petitioner's intent in the years involved herein. Abrams v. United States, 449 F.2d 662 (2d Cir. 1971). Indeed, this perspective also enables us to take into account post-1985 efforts by petitioner to enhance the profit potential of the farm. Nor do we accept respondent's sweeping dismissal of petitioner's testimony on the ground that it is self-serving. Clearly, we are not required to accept self-serving testimony as gospel. Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992). *622 However, we should not ignore such testimony since a decision as to whether a bona fide profit objective exists ultimately turns upon the taxpayer's intent based upon "a careful analysis of all the surrounding objective facts" and giving "greater weight * * * to such facts than to his [the taxpayer's] mere statement of intent." Dreicer v. Commissioner, 78 T.C. at 645. This is particularly true, in the instant case, where we found petitioner to be a credible witness, whose testimony was, to a substantial degree, corroborated by the credible testimony of his accountant and his farmer, and where no contradictory evidence was offered or elicited on cross-examination by respondent. *623 In the foregoing context, we turn to an analysis of the factors contained in section 1.183-2(b), Income Tax Regs. These factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. The parties have dealt with each factor, and we will do the same keeping in mind, however, that no one factor or number of factors but rather our evaluation of the record as a whole is determinative. Hendricks v. Commissioner, 32 F.3d 94 (4th Cir. 1994), affg. T.C. Memo. 1993-396; Keanini v. Commissioner, 94 T.C. at 47; Taube v. Commissioner, 88 T.C. 464, 480 (1987); sec. 1.183-2(b), *624 Income Tax Regs.
According to respondent, continuous substantial losses, petitioner's substantial outside income, and his recreational use of Waverly, belie the existence of the requisite profit objective during the years 1978 through 1985. The thrust of respondent's argument is that Waverly was a "hobby farm". [10] Petitioner counters that a review of the entire record supports his stated objective of making Waverly a "going farm" from which he would realize a profit. *625 The taxpayer's history of income or losses with respect to the activity
Petitioner acquired Waverly in 1977. From 1977 to 1992, petitioner claimed substantial losses on his Schedule F for every year. For the years in issue, 1978 to 1985, those losses totaled $ 1,120,944. While not determinative, [11] such a record of substantial losses is an "important factor" to consider. Golanty v. Commissioner, 72 T.C. at 426; sec. 1.183-2(b)(6), Income Tax Regs.[12]
*626 Under section 1.183-2(b)(6), Income Tax Regs., there is less concern over losses in the initial stages of an activity. A greater concern arises when unexplained losses have continued for an extended period of time. Allen v. Commissioner, 72 T.C. 28, 34 (1979). A large portion of petitioner's losses stems from the interest costs associated with the recourse debt petitioner incurred to purchase Waverly and related land costs. Petitioner testified that he intended to pay down the debt when possible, [13] although he had no timetable. It appears that petitioner made substantial progress along these lines as early as 1987 and that the indebtedness was, for all practical purposes, eliminated by 1992. See supra p. 14. Finally, petitioner testified as to a number of unexpected losses over the years at issue, such as the loss of a horse, theft by a horse trainer, the loss of a boat and soil and erosion *627 problems. To be sure, these losses represent only a fraction of the total losses, but here again this does not require us to ignore the unexpected loss element particularly in the early years. The amount of occasional profits
Petitioner testified that he thought operational profits would cover interest costs and that, once the debt was paid down, he could expect big profits, although he had not prepared any specific projections. If the costs associated with carrying the land and the element of appreciation are eliminated from consideration, petitioner earned an operating profit in 1977, 1978, and again in 1982, at which latter point, petitioner thought he had turned the corner. Admittedly, the 1982 profit may have been due to abnormally high commodity prices that year, rather than any changes on the farm, but that does not require us to ignore the fact that a profit was made. We also note that, if the commodity loss is eliminated from the Schedule F loss for 1983 and treated as a capital loss, as respondent claims it should be, petitioner would also have shown an operating profit for that year. Petitioner's anticipation of profits finds further support in the fact that *628 he realized a gross profit in 1992, when his interest expense had become nominal. We are not unaware that section 1.183-2(b)(7), Income Tax Regs., minimizes the impact of occasional small profits for an activity generating large losses. However, we are satisfied that this provision does not present an insuperable obstacle to the overall determination we are called upon to make herein. Expectation that assets used in the activity may appreciate in value
Sec. 1.183-2(b)(4), Income Tax Regs., provides that profit includes expected appreciation in assets such as land. Appreciation may explain petitioner's willingness to continue to sustain losses. Allen v. Commissioner, 72 T.C. at 36; sec. 1.183-2(b)(4), Income Tax Regs.[14] We have concluded that operational activities and the holding of Waverly are a single activity, so that appreciation in value of the property may offset the losses of the farming activity. *629 Petitioner testified as follows with respect to his intentions to profit from appreciation in the value of the land: I am convinced that this property has enormous potential to make money off it. It has been a question of getting the right combinations of things together. As we will get to, I assume shortly, beginning in '86, '87, I changed the approach to this operation dramatically. * * * I guess finally I would tell you that I have no doubt that I will make it profitable one of these days because I really have found nothing in this life that I couldn't succeed at, at some point.
Petitioner further testified: I bought this for a farm operation in which I thought I could make money on. I realized as time went by -- spending over a year looking at real estate and trying to learn what farms were worth that I saw any -- that at that point nobody would have dreamed of the kind of appreciation that has occurred in that property. In a sense, I might have had built-in some down-side protection if the farm couldn't be operated as a profitable farm, that I could probably unload it for what I had in it. But it was not bought as a speculative real estate venture. I *630 have been in speculative real estate ventures. That certainly wasn't one of them. * * * Well, in the sense, Your Honor, that I thought that in 1976/'77, that if you acquired a farm down in that area, the chances were that you weren't going to get hurt badly. Obviously I have dealt in enough real estate that -- I always try to sell something more than I paid for it in anything I had any money in. But it appeared to me -- that is, I had sort of something backing me up. I mean, I have bought speculative real estate. I own some speculative real estate now. This wasn't one of those ventures.
Although he did not expect as much appreciation as occurred, petitioner thought there would be enough to at least recover what he had put into the property. In this respect, we disagree with respondent's contention that petitioner did not expect appreciation in value to do more than enable him to come out whole. Our evaluation of petitioner's testimony is that his measurement of the impact of appreciation indicated the floor, not the ceiling, of his expectations. Petitioner made efforts to increase the value of the farm through various improvements to the main house and tenant houses *631 and several soil conservation projects. [15]
Waverly was purchased for $ 943,887 in 1977. As of August 1985, the last year in issue, petitioner and respondent have stipulated the value of Waverly as $ 1,731,000. This reflects a $ 787,113 increase in value, as compared to total Schedule F losses of $ 1,120,944. As it turned out, the accumulated expenses for interest and taxes from 1977 through 1985 totaled $ 807,580, as compared to appreciation of $ 787,113. While this appreciation did not entirely offset the land costs, the difference was quite small. Under these circumstances, we think that appreciation in value can appropriately be taken into account either by directly offsetting a substantial portion of the Schedule F losses or alternatively, in considering the operational farm activities independently of both the interest and taxes and the appreciation in value. Indeed, if one eliminates the interest and taxes from the Schedule *632 F losses for 1977 through 1985, the cumulative loss is reduced to $ 313,364. Keeping in mind that the years before us were the early years of operation, [16] i.e., the start-up years, we are not prepared to say that such losses preclude a finding that petitioner had the requisite profit objective.
We also note that the Schedule F losses (which represented cash outlays except for a minor amount of depreciation) constituted a percentage of petitioner's income larger than one would expect a taxpayer to be willing to sustain merely for the pleasure of having a farm as a hobby, even if the top tax bracket for the years at issue is taken into account. We again note, see supra note 10, that respondent does not contend that petitioner incurred the losses in order to generate tax savings. Cf. Estate of Baron v. Commissioner, 83 T.C. 542 (1984), *633 affd. 798 F.2d 65 (2d Cir. 1986); see also Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252, 258 (2d Cir. 1967) (Waterman, J., concurring). We are aware of the fact that among the elements which we must consider is the prospect that petitioner will be in a position to recoup his losses during the years at issue. Bessenyey v. Commissioner, supra. We see no need to explore the precise boundaries of the recoupment element under the circumstances herein. To be sure, the cumulative losses as of 1985 were substantial, but they become less significant when the appreciation in value is compared with the Schedule F losses. See supra p. 27. We are impressed with the fact that, in 1985, petitioner realized he would have to change his approach in the way he operated the farm, that he could no longer operate on a small budget and that he would have to make a substantial investment in order to make the farm profitable. In 1987, petitioner finally embarked on corrective measures that could make his farm profitable, i.e., the game-bird breeding *634 and horse-racing activities. Since 1988, petitioner's revenues have increased dramatically, supra p. 13, and have reached a level higher than one would associate with a mere hobby. It appears that petitioner has not yet earned a substantial profit only because he is making further substantial investments. In this context, we think it significant that, in 1992, interest expense had become nominal ($ 919) and gross income had substantially increased with the result that, if the remaining land costs and other depreciation [17] are excluded, petitioner realized a small positive cash flow. Given these recent activities and the potential of further appreciation in the value of Waverly, we do not think that the possibility of recoupment of prior losses was so remote that this element, considered in light of the record as a whole, should cause the scales to be tipped against a finding that petitioner had a bona fide profit objective. We hasten to add, however, that our analysis of the existence of a profit objective in the years before us has little, if any, bearing on whether petitioner had such an objective in post-1985 years. Cf. Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 336 n. 13 (1968); *635 Daugherty v. Commissioner, T.C. Memo. 1983-188. The financial status of the taxpayer
Respondent contends that petitioner's substantial outside income also weighs against him. Sec. 1.183-2(b)(8), Income Tax Regs.[18] Respondent's point is best seen by comparing petitioner's Schedule F losses against outside income for the years in issue, as follows: Year
Schedule F Loss
[1] Nonfarm Income 1978
$ 73,479 $ 113,258
1979
143,754
110,648
1980
145,478
150,001
1981
155,452
394,654
1982
23,259
417,167
1983
260,424
406,382
1984
161,832
412,805
1985
157,266
[2] 804,549
*636 It cannot be disputed that, for 1981 onward, petitioner had the means to support a "hobby farm", if he chose. Petitioner counters that as long as tax rates are less than 100 percent, there is no benefit from losses. Engdahl v. Commissioner, 72 T.C. at 670. While respondent's point is a relevant factor to be considered, we are reminded of our observation in Engdahl v. Commissioner, 72 T.C. at 670: [19]
In cases of this kind, the concurrent existence of other income poses the question, rather than answers it. * * * Properly construed, the regulation merely makes the commonsense point that the expectation of being able to arrange to have the tax collector share in the cost of a hobby may often induce an investment in such a hobby which would not otherwise occur. The essential question remains as to whether there was a genuine hope of economic profit. * * *
*637 Manner in which the taxpayer carries on the activity
From the beginning, petitioner hired an accountant experienced in farm accounting to review his records, maintain a general ledger, and prepare his Schedule Fs. Respondent argues that a $ 2,500 discrepancy in the cost of grain storage bins, infra pp. 37-38, and the assigning of a commodities trading loss to his expenses for seeds and plants shows a deficiency in the records. [20] We disagree. These are simply two instances of dispute between petitioner and respondent in respect of the proper tax treatment of two specific items. There is no evidence to contradict the testimony of petitioner's accountant that petitioner has maintained accurate and timely records for the duration of the activity. Compare Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523. *638 Petitioner regularly sought advice from his uncle (who had experience in farming) and State officials on how to improve his farm's prospects. He implemented new farming techniques such as adopting crop rotation, introducing soybeans, experimenting with different fertilizers, and narrowing the space between crop rows. He replaced the existing farmer with one he thought would obtain a better crop yield and be more receptive to ideas for improvement. This is all evidence of a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs.
Petitioner's regular experimentation with new sources of revenue is further evidence of a profit objective. Cf. Ronnen v. Commissioner, 90 T.C. 74, 93 (1988); [21] compare Hendricks v. Commissioner, 32 F.3d 94, 97 (4th Cir. 1994), affg. T.C. Memo. 1993-396. He began a hunting operation which he changed over time from a lease of hunting rights to a guided operation to the use of a commercial hunting operator and then to another lease. He purchased grain storage bins so as to take advantage of the annual ebb and flow of the commodity markets. During the years in issue, *639 besides farming and hunting, petitioner tried to raise revenue by adding a crabbing operation, hiring a horse trainer to start a horse-selling venture, giving horse riding lessons, and boarding horses (paying out of his personal funds for the cost of boarding his daughter's horses). He aborted those attempts that were not profitable, including the crabbing and hunting operations. In 1987, petitioner started a game-bird breeding operation that, as of the date of trial, sells 30,000 to 40,000 game birds per year. Petitioner's horse venture has evolved into a thoroughbred horse-racing operation that earned $ 272,354 in purses and bonuses in 1992. Respondent argues that petitioner's failures to consult professionals before purchasing the farm and/or to hire outside farm management or consultants despite continuing losses, and to prepare written projections or feasibility studies show that the farm was not operated in a businesslike *640 manner. [22] *641 Petitioner responds that his farmer testified that petitioner was extremely knowledgeable about farming, and he fired the existing farm manager to reduce expenses, so we draw little, if anything, from the failure to rely on outside help, particularly where it would have required additional expenditures. As for projections or feasibility studies, petitioner testified he prepared a written projection on the back of an envelope. Clearly, proof of detailed projections or feasibility studies would be evidence of a profit objective, but we are not convinced that their absence herein necessarily evinces the lack of a profit motive. Cf. Dreicer v. Commissioner, 665 F.2d 1292, 1299 (D.C. Cir. 1981), revg. T.C. Memo. 1979-395 ("the objective, not the expectation, of making a profit is to govern determinations on whether a taxpayer is engaged in a business or a hobby, and the two criteria are not the same").[23]
We conclude that petitioner operated the farm in a business-like manner. Elements of personal pleasure or recreation
Respondent further contends that Waverly was a waterfront vacation home used for personal recreational purposes. Petitioner hunted at Waverly and, when he had custody, brought his children to Waverly. While at Waverly, his son sailed and his daughter rode horses. Respondent also relies on the installation of air conditioning in the farm's main house and the boarding of guests in the main house. However, based on the entire record, while there were elements of personal recreation, they were never more than incidental to the farming activity. While petitioner may have relished the duties associated with Waverly, given his workaholic nature, his farming activities were not in the nature of one partaking in a hobby. Jackson v. Commissioner, 59 T.C. 312, 317 (1972) ("suffering has never been a prerequisite to deductibility").[24] Petitioner engaged in substantial *642 managerial activities, such as overseeing the farmer's work, dealing with government officials, deciding on whether to participate in the government's set aside program, obtaining financing, tracking the commodity markets, learning new methods to introduce to the farm, creating new sources of revenue, and the hiring and firing of personnel. It would have been less expensive, in terms of both time and money, for petitioner to have bought himself a house without the farm, if he had desired a vacation home. Engdahl v. Commissioner, 72 T.C. at 670. In short, Waverly was not a vacation home. The expertise of the taxpayer or his advisors
Petitioner's family owned farms when he was growing up, and he aided a cousin in researching the purchase of a farm several years before purchasing Waverly. He spent *643 some effort in locating a farm to purchase, both in the area where he eventually purchased the farm, and in Lancaster, Pennsylvania. In his search, he obtained advice from his uncle who ran a profitable farm, real estate agents, neighboring farmers, and various government agencies. Once he purchased the farm, petitioner continued to get advice from his uncle, government agencies, and his farmer. His farmer testified that petitioner was extremely knowledgeable about farming, and that he adopted some of the techniques petitioner brought to Waverly. Further, the actual farming was done by this professional farmer, who worked the 270 acres on petitioner's farm and approximately 3,000 acres in total. Respondent argues that, while petitioner may have been exposed to the daily tasks on a farm while growing up, it is unlikely that petitioner had any experience in the financial aspects of running a farm. This ignores the study petitioner made with his cousin and the efforts he undertook to find a farm to purchase. Further, we do not accept the proposition that the financial aspects of running a farm were too complicated for an intelligent professional to learn in an informal manner. *644 Clearly, petitioner knew the economics after his purchase, as indicated by his purchase of the grain storage bins to take advantage of seasonal price fluctuations. The time and effort expended by the taxpayer in carrying on the activity
Petitioner spent from 500 to 700 hours per year, including most weekends, on farm business at Waverly. From his office in Philadelphia, he maintained almost daily contact with his farmer, and tracked progress of the commodity markets. He corresponded with his accountant several times a year and interacted with government agencies. He took time off from his legal practice when necessary to take care of farm matters. Simply, petitioner's "full-time" career as a lawyer does not preclude a finding that his farm activity was for profit, [25] especially since the time-consuming work of farming was performed by a professional farmer. Sec. 1.183-2(b)(3), Income Tax Regs.[26]
*645 The success of the taxpayer in carrying on other similar or dissimilar activities
Petitioner is a successful lawyer. From 1978 to 1984, he was a partner at a large Philadelphia law firm. From 1985 through the date of trial, petitioner has been managing partner of his own successful law firm. However, Waverly is the first and only farm petitioner has owned or managed. Overall, this factor is relevant to the extent it measures petitioner's willingness to take risks and his devotion to nurturing a new endeavor. We think the record herein reflects a supreme confidence on the part of petitioner that he could achieve a comparable success with the farm at Waverly and would be able to provide himself with a source of income which would enable him to afford a renewed career in public service. Conclusion
This is one of those cases where we are satisfied that, despite the substantial losses, petitioner had a bona fide profit objective during the taxable years before us. Cf. Engdahl v. Commissioner, 72 T.C. 659 (1979) (horse breeding losses for 12 years); Allen v. Commissioner, 72 T.C. 28 (1979) (losses for *646 11 years); see Faulconer v. Commissioner, 748 F.2d 890 (4th Cir. 1984), revg. and remanding T.C. Memo. 1983-165 (losses in 25 of 27 years).[27] Farming, especially, is an activity in which sustained losses are not unusual. Over 70 years ago, the Board of Tax Appeals stated: If losses, or even repeated losses, were the only criterion by which farming is to be judged a business, then a large proportion of the farmers of the country would be outside the pale. It is the expectation of gain, and not gain itself which is one of the factors which enter into the determination of the question. * * * [Riker v. Commissioner, 6 B.T.A. 890, 893 (1927).]
See also Faulconer v. Commissioner, 748 F.2d at 900 n. 12 *647 ("We note parenthetically that farming is not the most profitable business in which one can be engaged."). While petitioner may have been overly optimistic in his initial approach to Waverly, it is not for this Court to second-guess petitioner's business judgments. See Cornfeld v. Commissioner, 797 F.2d 1049, 1053 (D.C. Cir. 1986), revg. and remanding T.C. Memo. 1984-105; Sheldon v. Commissioner, 94 T.C. 738, 773 (1990) (Wells, J., concurring and dissenting); Snow Mfg. Co. v. Commissioner, 86 T.C. 260, 269 (1986); Riker v. Commissioner, 6 B.T.A. 890, 893 (1927). We find as an ultimate finding of fact that petitioner had the requisite profit objective during the early years of his farming activities which are the years before us. II. COST BASIS OF GRAIN STORAGE BINS The second issue for decision is the cost basis of certain grain bins purchased by petitioner in 1979. Petitioner claimed a cost basis of $ 50,617, whereas respondent contends the cost basis is only $ 48,117. Petitioner has canceled checks totaling $ 48,117.41 *648 from the purchase of the grain storage bins. A check for an additional $ 2,500 was marked void. Petitioner testified that the total purchase price was $ 50,617.41, which is what was reflected on his records and used as a cost basis for depreciation. A letter from the seller of the bins instructs petitioner to reduce the balance of the bill by $ 2,500 and states that an accessory, an auger, would be delivered shortly. Petitioner testified that the auger was eventually delivered and, although never used, was paid for and should be included in the cost basis. There is no written record of the auger being paid for. Petitioner contends that after delivery, the auger was exchanged in partial payment for a grain elevator. Petitioner has provided no proof of delivery, of payment, of receipt, or of the later exchange. Petitioner has failed to meet his burden of proving the cost of the bins was greater than $ 48,117. Rule 142(a). III. PETITIONER'S 1978 FILING STATUS The next issue we must decide is whether petitioner's filing status for 1978 was married filing jointly or married filing a separate return. In the stipulation of facts, petitioner concedes "the adjustment made by *649 respondent in the notice of deficiency for the taxable years 1978, 1984 and 1985, with respect to filing status" (emphasis added). In light of this concession, we find it difficult to understand why both parties have seen fit to argue the issue on brief. However, since the parties have done so, we will address the issue. In filing the 1978 return, petitioner signed his name and the name of his wife, indicating that he had signed for her. Petitioner testified that he understood he had the authorization and consent of his wife to sign her name. The parties have stipulated that the wife cannot now recall whether she had given petitioner authorization. Petitioner and his spouse were married as of the end of 1978, but there is some indication they were separated and/or divorced shortly thereafter. On April 15, 1982, petitioner's wife filed a separate return for the 1978 taxable year. [28]
A husband and wife *650 may file a joint return. Sec. 6013. The regulations require that both spouses sign a joint return, although one spouse may sign a return as an agent for the other, in which case the provisions of section 1.6012-1(a)(5), Income Tax Regs., shall apply. Sec. 1.6013-1(a)(2), Income Tax Regs.Section 1.6012-1(a)(5), Income Tax Regs., limits the use of agents to specific situations, none of which are applicable to the present factual situation. In those instances where one spouse does sign for the other, a dated statement signed by the spouse who is signing must be attached, stating the name of the return, the taxable year, the reason for the other spouse's incapacity, and that the incapacitated spouse consented. The return in question did not comply with this regulation. However, we have held that a tax return may be a joint return even though the signature of one spouse is missing, if both spouses intended the return to be a joint return. Estate of Campbell v. Commissioner, 56 T.C. 1, 12-14 (1971); [29] cf. Anjoorian v. United States, 78-2 USTC par. 9837, 43 AFTR2d 79-429 (R.I. 1978) (citing Kann v. Commissioner, 210 F.2d 247, 251-252 (3d Cir. 1953)). *651 Petitioner has testified as to his intent, but there is not sufficient evidence as to his wife's intent. It is only stipulated that petitioner's wife cannot recall whether she authorized the filing of a joint return. Of some relevance is the fact that petitioner's wife filed a separate return for the 1978 taxable year, albeit the filing was untimely. On the record before us, we are unable to find the necessary intent of petitioner's spouse. [30]
*652 Petitioner's argument as to tacit consent is misplaced. This doctrine applies only where the Commissioner has determined that a joint return has been filed and a presumption of correctness arises. Hennen v. Commissioner, 35 T.C. 747, 749 (1961). IV. ADDITIONS TO TAX The final issue for consideration is petitioner's liability for additions to tax for negligence or intentional disregard of rules and regulations. The sole item in dispute at this time for which respondent determined negligence or intentional disregard of regulations is the misstatement of the purchase price of the grain bins, supra pp. 33-34. As discussed above, petitioner initially intended to purchase an item for $ 50,617. Part of the item was not delivered, and the purchase price was reduced. We find there was merely a miscommunication between petitioner and his accountant, which does not warrant a penalty for negligence. The remaining items for which respondent determined negligence or intentional disregard of regulations are for items which are not in issue at this time. We decline to decide whether an addition to tax, under section 6653, would be appropriate due to *653 these items until such time as we are required to deal with the underlying controversy. Similarly, we will not discuss additions to tax under sections 6659 and 6661, for these items, at this time. We leave these issues to another day. In her brief, respondent raises for the first time the argument that petitioner's claimed Schedule F losses caused an underpayment due to negligence or intentional disregard of rules or regulations. However, regardless of which party carries the burden of proof on this issue, [31] because we have found petitioner had a profit objective, there is no underpayment in respect of the claimed Schedule F losses. In order to dispose of the severed issues in accordance with the foregoing, An appropriate order will be issued. Footnotes
1. All statutory references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. Addition to tax is 50% of the interest due on the underpayment due to negligence.↩
2. On the date of purchase, the actual purchaser was Waverly Farm Associates, a limited partnership, to which the adjoining landowner and his wife contributed $ 100,000. Later, the transaction was rearranged so the $ 100,000 was treated as a loan, and the property was transferred to petitioner, personally, in May 1979. Petitioner testified that, from the beginning, he treated the property as being owned personally.↩
1. For 1990, petitioner did not separately list income from game-bird sales and grain sales. The combined sales were $ 104,721.↩
3. There was evidence introduced at trial that valued Waverly as of August 1989, but we have determined that this evidence is hearsay and too ephemeral to be taken into account.↩
1. Sales are shown net of cost of horses sold.↩
3. For 1986 onward, hunting income was not listed separately.↩
2. Includes agricultural payments and other miscellaneous income.↩
4. For 1990, petitioner did not separately list income from game-bird sales and grain sales.The combined sales were $ 104,721.↩
1. This amount includes a $ 76,584 loss from commodities transactions, which inclusion has been challenged by respondent but is not at issue at this time.↩
1. Includes $ 389,714 representing petitioner's partnership interest in his former firm.↩
4. Sec. 183(b) allows certain deductions that would be allowable without regard to whether or not such activity is engaged in for profit, and other deductions that would be allowable only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable without regard to whether such activity is engaged in for profit.↩
5. The regulation provides in part: (d) Activity defined -- (1) Ascertainment of activity. * * * In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. * * *↩
6. See Sparre v. Commissioner, T.C. Memo. 1980-45↩ (farming and gun club activities were intermingled activities in Kent County, Maryland, a neighboring county to the county in which petitioner's farm is located).
7. The regulation provides in part: Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).↩
8. See also Fields v. Commissioner, T.C. Memo. 1981-550; Sparre v. Commissioner, T.C. Memo. 1980-45. Accord Hambleton v. Commissioner, T.C. Memo. 1982-234. Contra LaMusga v. Commissioner, T.C. Memo 1982-742↩.
9. Indeed, the positions taken by the parties herein have, from the outset of the Court's involvement in the case, appeared to reflect an overzealousness which impeded their ability successfully to arrive at a settlement by closing what the Court understands was a gap of less than 10 percent of the deficiencies not including additions to tax. Cf. Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 451-452↩ (1980).
10. Respondent does not contend that petitioner used Waverly to generate tax losses, like those individuals that caused Senator Albert Gore to remark: Wealthy individuals have invested in certain aspects of farm operations solely to obtain "tax losses" -- largely bookkeeping losses -- for use to reduce their tax on other income. * * * * * * * * * One of the remarkable aspects of the problem is pointed up by the fact that persons with large nonfarm income have a remarkable propensity to lose money in the farm business. [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 635; emphasis supplied.]
See infra↩ p. 29.
11. See Kaehn v. Commissioner, T.C. Memo. 1987-608; Archer v. CommissionerT.C. Memo. 1987-70↩.
12. Sec. 1.183-2(b)(6), Income Tax Regs., provides: A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. * * *↩
13. See Rider v. Commissioner, T.C. Memo. 1988-288↩.
14. See also Fields v. Commissioner, T.C. Memo. 1981-550↩.
15. See Sparre v. Commissioner, T.C. Memo. 1980-45↩.
16. See Fields v. Commissioner, T.C. Memo. 1981-550; compare Kaehn v. Commissioner, T.C. Memo. 1987-608↩.
17. Depreciation of equipment amounted to $ 46,339.87 in 1992.↩
18. The regulation provides: "Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved."↩
1. Includes gross income from practice of law, and interest and dividend income.↩
2. Includes $ 389,714 from partnership interest in former firm.↩
19. See Kaehn v. Commissioner, T.C. Memo. 1987-608↩.
20. Respondent has contested the inclusion of a claimed loss from commodities transactions in the amount of $ 76,584 in petitioner's Schedule F for 1983. The parties have agreed this dispute will not be decided at this time.↩
21. See Roberts v. Commissioner, T.C. Memo. 1987-182↩.
22. With respect to respondent's argument that petitioner failed to look at the previous owner's records, we have found that he did obtain financial information from such owner. See supra↩ p. 6.
23. Accord Meaney v. Commissioner, T.C. Memo. 1994-91↩.
24. As we have previously observed: "Pleasure and business, unlike oil and water, can sometimes be mixed." McDonell v. Commissioner, T.C. Memo. 1967-18↩.
25. Rider v. Commissioner, T.C. Memo. 1988-288↩.
26. See Arwood v. Commissioner, T.C. Memo. 1993-352; Scheidt v. Commissioner, T.C. Memo. 1992-9↩.
27. See also Rider v. Commissioner, T.C. Memo. 1988-288 (farm losses for 9 straight years); Archer v. Commissioner, T.C. Memo. 1987-70↩ (farm losses for 7 straight years).
28. The record does not reflect whether petitioner included his wife's income and deductions in his return.↩
29. See Pattison v. Commissioner, T.C. Memo. 1982-116↩.
30. See LeBeau v. Commissioner, T.C. Memo. 1980-570 (taxpayer's wife testified at trial but was not asked about returns); Roden v. Commissioner, T.C. Memo. 1974-148; compare Hill v. Commissioner, T.C. Memo. 1971-127 (taxpayer's wife testified as to intent); Pattison v. Commissioner, T.C. Memo. 1982-116↩.
31. Respondent carries the burden of proof as to new matters. See Rule 142(a); Zirker v. Commissioner, 87 T.C. 970↩ (1986).