T.C. Memo. 2001-242


UNITED STATES TAX COURT


MICHAEL L. AND SUSAN BARNARD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11118-99.                    Filed September 17, 2001.


<u>Carolyn J. Jackson</u> and <u>Richard Craig Krause</u>, for
petitioners.

<u>Alexandra E. Nicholaides</u> and <u>Timothy S. Murphy</u>, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioners petitioned the Court to
redetermine respondent's determination of deficiencies in their
1987, 1988, and 1989 Federal income taxes, additions to their
1987 and 1988 taxes for fraud, and a penalty for fraud as to

1989. Respondent determined deficiencies of $11,253, $15,996, and $14,689 for the respective years. Respondent also determined that petitioners were liable for an $8,440 addition to their 1987 tax under section 6653(b)(1)(A), an $11,997 addition to their 1988 tax under section 6653(b)(1), and an $11,017 penalty for fraud as to 1989. Respondent also determined that petitioners were liable for a time-sensitive addition to their 1987 tax under section 6653(b)(1)(B).

We must decide whether petitioners are liable for the deficiencies, additions to tax, and penalty. We hold they are liable for the deficiencies to the extent stated herein and that they are not liable for any of the additions to tax or the penalty. Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the relevant years. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some facts have been stipulated. We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith. We find the stipulated facts accordingly. Petitioners resided in Charlevoix, Michigan (Charlevoix), when their petition was filed. They filed joint 1987, 1988, and 1989 Federal income tax returns.

Michael Barnard (Mr. Barnard) grew up in East Jordan, Michigan. Upon graduating from high school, he attended the

General Motors (GM) Institute and received a degree in mechanical engineering in 1966. During the next 15 years, he worked as an engineer for GM Corp. He married Susan Barnard (Ms. Barnard) on February 14, 1981. Ms. Barnard is a registered nurse.

Petitioners owned property in Charlevoix on which they constructed a facility that included a restaurant and bar (collectively, the restaurant) and a 12-room motel (motel). Petitioners began operating the restaurant and the motel in late 1982 as unincorporated businesses and incorporated those businesses in the middle of 1986 under the name Nanny's, Inc. (Nanny's).[1] For the remainder of 1986 throughout the end of 1988, Nanny's operated as a C corporation that reported its income and expenses for Federal income tax purposes on the basis of the calendar year. Nanny's elected to be treated as an S corporation effective with its taxable year beginning on January 1, 1989.

Ms. Barnard oversaw Nanny's daily operation. Nanny's received most of its income in cash, and petitioners deposited Nanny's receipts into a cash register. Each morning, Ms. Barnard reconciled the cash in the register to the cash register tape of Nanny's business for the previous day. Afterwards, petitioners left some of the cash in the register for the current day's

---

[1] Petitioners' basis in their Nanny's stock was $10,000 upon incorporation and at all relevant times thereafter (except to the extent that their basis is reduced pursuant to this report).

business (including the payment of vendors) and either deposited the remaining cash into Nanny's checking account (business account) or secured it for safekeeping at the restaurant or at their home. Petitioners deposited into the business account only the portion of Nanny's gross receipts necessary to cover its anticipated expenses which would be paid by check. When Nanny's did not have enough funds in the business account to pay business expenses, petitioners usually paid the expenses directly with the secured cash or transferred the cash to the business account and paid the expenses by check. On many occasions, petitioners used their own funds to pay Nanny's business expenses and used Nanny's funds to pay their personal expenses. Petitioners generally operated Nanny's business in the same manner after its incorporation as they did before its incorporation; i.e., as an alter ego of themselves.

Following Ms. Barnard's reconciliation of the cash in the register to the cash register tapes, petitioners recorded the gross receipts onto daily sheets and discarded the cash register tapes. They also discarded the daily sheets after Mr. Barnard used them to prepare monthly summaries of Nanny's income and expenses which he gave to his longtime accountant, Hugh Mason (Mr. Mason), to prepare the required tax returns (e.g., sales tax, income tax) and financial statements. Petitioners kept no written record of the amount of Nanny's gross receipts that was

not deposited into the business account.  Nor did they keep any detailed records as to the amount of their personal funds which they used in Nanny's business or as to the amount of Nanny's funds which they used personally.  For both Federal income tax and financial accounting purposes, Mr. Mason calculated at the end of each year the balance of any loan that he considered to exist between Nanny's and petitioners on account of Nanny's use of petitioners' funds and vice versa.

Petitioners also owned a mobile home park called Lake Michigan Heights Mobile Home Park (Lake Michigan Heights) and a building with office and retail space called Bridge Street Centre (Bridge Street).  All payments to Lake Michigan Heights and Bridge Street were made by check, and petitioners deposited all of these checks into the separate bank accounts of Lake Michigan Heights and Bridge Street.  Petitioners operated Lake Michigan Heights and Bridge Street as unincorporated businesses.  For the respective years from 1987 through 1989, petitioners reported on their income tax returns, as initially filed, that they had received rent of $27,893, $28,375, and $37,871 as to Lake Michigan Heights and $81,305, $87,503, and $94,394 as to Bridge Street.

Nanny's Old Place is petitioners' unincorporated business that rents to Nanny's the real estate petitioners owned in Charlevoix.  Petitioners received rent checks from Nanny's

totaling $60,000 in 1987, $60,000 in 1988, and $60,000 in 1989. Petitioners deposited all of these checks into the Bridge Street account.

Petitioners sometimes bought items or paid expenses using cashier's checks which they purchased with cash or using the proceeds of cashier's checks which they purchased with cash and which were payable to Mr. Bernard.[2]  In September 1988, they bought a boat (the Tollycraft) for $196,620.  They paid part of the Tollycraft's purchase price with the proceeds of three $9,000 cashier's checks which they had purchased with cash on July 25 and 26, 1998, and August 11, 1998, respectively, and which were payable to Mr. Bernard.[3]  They paid another $150,025 of the Tollycraft's purchase price with the proceeds of a loan.  They reported for State sales tax purchases that the purchase price of the Tollycraft was $161,021, and they remitted to the State of Michigan a $6,585.84 cashier's check (payable to the State of Michigan) in payment of the sales tax.  In 1989, Ms. Barnard paid her childcare expenses using cashier's checks in the amounts of

---

[2] Petitioners also bought items and paid expenses using other than cashier's checks.  Many of these items and expenses exceeded $10,000 in amount.

[3] Each of these cashier's checks listed on its face that Mr. Barnard was the purchaser of the check.  Mr. Barnard signed these checks and presented them to the Tollycraft's seller in partial payment of the boat.

$256.15, $705.40, and $1,076.90.  She also purchased a $1,083.04 cashier's check payable to a seller of furniture.

In 1988 and 1989, the Charlevoix County State Bank (the Bank) delivered to respondent various "Suspicious Transaction Reports" (STRs) as to petitioners.  These STRs reported the following transactions made by petitioners:

| Date | Transaction |
| --- | --- |
| July 1, 1988 | $3,647 cash payment on a $330,000 loan (the first loan) dated December 15, 1986 |
| July 5, 1988 | $3,647 cash payment on the first loan |
| July 18, 1988 | $9,000 cash purchase of a cashier's check payable to American Marine Electronics for unidentified goods or services |
| July 22, 1988 | $9,000 cash purchase of cashier's check payable to Mr. Barnard |
| July 25, 1988 | $9,000 cash purchase of a cashier's check payable to Mr. Barnard |
| July 26, 1988 | $9,000 cash purchase of a cashier's check payable to Mr. Barnard |
| Aug. 11, 1988 | $9,000 cash purchase of a cashier's check payable to Mr. Barnard |
| Aug. 24, 1988 | $6,565.84 cash purchase of a cashier's check payable to the State of Michigan for the sales tax on the Tollycraft |
| Oct. 13, 1988 | $8,000 cash payment on a second loan |
| Jan. 23, 1989 | $5,000 cash purchase of a cashier's check payable to a contractor in partial payment for services that |

it performed at Lake Michigan Heights

| | |
|---|---|
| Feb. 15, 1989 | $3,647 cash payment on the first loan |
| Feb. 20, 1989 | $4,545.30 cash purchase of a cashier's check payable to a contractor in full payment for unidentified goods or services |
| June 29, 1989 | $3,647 cash payment on the first loan |
| July 21, 1989 | $3,647 cash payment on the first loan; $1,200.56 cash payment on a third loan |
| Sept. 11, 1989 | $9,000 cash purchase of a cashier's check payable to a contractor as first of four payments on $32,940 of services that it performed at Lake Michigan Heights |
| Sept. 18, 1989 | $1,200 cash payment on the third loan; $9,000 cash purchase of a cashier's check payable to a contractor as second of four payments on $32,940 of services that it performed at Lake Michigan Heights |
| Oct. 3, 1989 | $9,000 cash purchase of a cashier's check payable to a contractor as third of four payments on $32,940 of services that it performed at Lake Michigan Heights |
| Oct. 20, 1989 | $3,647.82 cash payment on the first loan; $5,940 cash purchase of a cashier's check payable to a contractor as final payment on $32,940 of services that it performed at Lake Michigan Heights |
| Nov. 9, 1989 | $3,647.82 cash payment on the first loan |

The STRs stated specifically that a financial institution reporting a suspicious transaction must "Give brief summary of the suspected violation, explaining what is unusual or irregular about the transaction."  The STRs issued by the Bank as to petitioners did not explain why the Bank considered the transactions either unusual or irregular.  The Bank's practice was that it would prepare:  (1) The currency transaction reporting form required by 31 U.S.C. sec. 5313 and 31 C.F.R. sec. 103.22 (2000), as to any nonexempt customer who in a single day transacted business at the Bank involving cash totaling more than $10,000 and (2) an STR as to any other nonexempt customer who the Bank perceived was engaging in a "suspicious activity".  The Bank generally considered exempt customers to be those retail businesses that dealt with cash in the normal course of business.  The Bank did not consider either petitioners or Nanny's to be an exempt customer.

Respondent notified petitioners on April 3, 1990, that he would be auditing Nanny's 1988 taxable year.[4]  Two months later, respondent began auditing petitioners' 1987 through 1989 years.  Immediately before respondent notified petitioners that their personal returns would be audited, Mr. Barnard reviewed his records for Bridge Street and Lake Michigan Heights and

_____

[4] Respondent's audit of that year concluded that Nanny's income and expenses were reported correctly on its Federal income tax return.

discovered that he had underreported his income from those activities; petitioners had originally estimated the income from these activities for Federal income tax purposes by way of rough calculations. When respondent notified petitioners that he would be auditing their personal returns, Mr. Barnard notified respondent that petitioners had just amended (but not yet filed) their 1987, 1988, and 1989 personal income tax returns to report additional rental income. Mr. Barnard gave those amended returns to Revenue Agent Bruce Smith (Revenue Agent Smith) pursuant to his request. The 1987 amended return reported additional income of $16,030 and $1,860 from Bridge Street and Lake Michigan Heights, respectively. The 1988 amended return reported additional income from those respective rentals of $20,963 and $1,850. The 1989 amended return reported additional income of $24,840 from Bridge Street and a reduction of income of $3,959 from Lake Michigan Heights. Because respondent never processed any of these amended returns, the deficiencies shown in the notice of deficiency include the underpayments reflected on those returns.

On February 12, 1991, Revenue Agent Smith referred petitioners' 1987, 1988, and 1989 returns to respondent's Criminal Investigation Division. The assigned agent, Special Agent Robert Keller, concluded that he could ascertain petitioners' taxable income only through an indirect method of

income calculation. Mr. Keller's conclusion was based on his determination that: (1) Petitioners maintained inadequate records as to their income and expenses, (2) petitioners appeared to be living a lifestyle that did not comport with their reported income, and (3) respondent had received the STRs as to petitioners.

For purposes of the notice of deficiency, respondent determined petitioners' income using the net worth method (the same method used by Mr. Keller). Respondent's notice of deficiency lists that petitioners' net worth, increase in net worth, total net worth, and personal living expenses were as follows for the related years:

|                          | 12/31/86   | 12/31/87   | 12/31/88    | 12/31/89    |
|--------------------------|------------|------------|-------------|-------------|
| Bank accounts            | $19,422    | $3,369     | $5,256      | $1,707      |
| Investments              | 113,330    | 111,401    | 109,249     | 115,814     |
| Boats and automobiles    | 115,345    | 95,149     | 250,089     | 250,089     |
| Real estate              | 39,700     | 45,450     | 45,450      | 45,450      |
| Rental properties        | 884,009    | 933,581    | 998,066     | 1,206,032   |
| Total assets             | 1,171,806  | 1,188,950  | 1,408,110   | 1,619,092   |
|                          |            |            |             |             |
| Total liabilities        | (877,013)  | (839,854)  | (1,000,991) | (1,122,085) |
| Net worth                | 294,793    | 349,096    | 407,119     | 497,007     |
|                          |            |            |             |             |
| Prior year's net worth   |            | (294,793)  | (349,096)   | (407,119)   |
|                          |            |            |             |             |
| Increase in net worth    |            | 54,303     | 58,023      | 89,888      |
|                          |            |            |             |             |
| Personal living expenses |            | 24,319     | 45,392      | 20,396      |
| Personal losses          |            | 10,196     |             |             |
|                          |            | 88,818     | 103,415     | 110,284     |
|                          |            |            |             |             |
| Nontaxable items         |            | (3,380)    | (2,546)     | (462)       |
|                          |            |            |             |             |
| Corrected adjusted gross income |     | 85,438     | 100,869     | 109,822     |
|                          |            |            |             |             |
| Adjusted gross income per return |    | (38,335)   | (37,386)    | (51,229)    |
|                          |            |            |             |             |
| Understated adjusted gross income |   | 47,103     | 63,483      | 58,593      |

The understated adjusted gross income amounts led to the subject deficiencies. As to the understated amounts, the parties agree that $17,890, $22,813, and $20,881 for 1987, 1988, and 1989, respectively, are attributable to Lake Michigan Heights and Bridge Street, and only those amounts are understatements attributable to those properties. Respondent asserts that the remaining understatements of $29,213, $40,670, and $37,712, respectively, are attributable to Nanny's. As we understand respondent's position as to the unreported income attributable to

Nanny's, all of those amounts are taxable to petitioners as constructive dividends.

Nanny's realized taxable income in 1986, 1987, and 1988 of $2,436, $18,659, and $31,529, respectively, and recognized all of these amounts on its Federal income tax returns. Its retained earnings at the ends of those years were $2,070, $18,077, and $32,306, respectively. Its retained earnings at the end of 1988 were net of a $12,500 dividend that it paid to petitioners during that year. Nanny's realized ordinary income of $48,006 in 1989, all of which petitioners recognized for that year.

OPINION

We decide first whether petitioners are liable for the deficiencies determined by respondent. Respondent used the net worth method to determine petitioners' income for the subject years. When a taxpayer fails to keep adequate books and records, section 446(b) authorizes the Commissioner to compute the taxpayer's income by any method that clearly reflects income. Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965). The net worth method has been accepted by the Courts as satisfying this legislative mandate. E.g., Holland v. United States, 348 U.S. 121 (1954). The Commissioner's determination of tax liability, when calculated under the net worth method, is presumptively correct and places upon the taxpayer the burden of proving it wrong. Helvering v. Taylor, 293 U.S. 507 (1935); Kearns v.

Commissioner, 979 F.2d 1176, 1178 (6th Cir. 1992), affg. T.C. Memo. 1991-320; Traficant v. Commissioner, 884 F.2d 258, 263 (6th Cir. 1989), affg. 89 T.C. 501 (1987); Calderone v. United States, 799 F.2d 254, 258 (6th Cir. 1986).  A taxpayer must generally prove by a preponderance of the evidence that respondent's determination is erroneous.  Helvering v. Taylor, supra at 515; Traficant v. Commissioner, supra at 263; Calderone v. United States, supra at 258.

Income is computed under the net worth method by determining a taxpayer's net worth at the beginning and end of a taxable year.  The difference between those two amounts is the increase in the taxpayer's net worth.  This difference is increased by adding nondeductible expenditures, e.g., living expenses, and by subtracting gifts, inheritances, loans, and other nontaxable receipts.  Holland v. United States, supra at 125; United States v. Giacalone, 574 F.2d 328, 330-331 (6th Cir. 1978).  An increase in a taxpayer's net worth, plus his or her nondeductible expenditures, less nontaxable receipts, may be considered taxable income.  Holland v. United States, supra.

Petitioners argue primarily that respondent's use of the net worth method was inappropriate because, they assert, they maintained sufficient records as to their income.  We disagree. First, as a point of fact, petitioners did not maintain sufficient records from which respondent could accurately compute

their personal income tax liability. Second, respondent applied the net worth calculation to each year only after respondent audited Nanny's 1988 taxable year and determined that some of Nanny's cash receipts had been commingled with petitioners' personal funds and that Nanny's records did not allow for a proper accounting of the commingled funds. The bare summaries which petitioners maintained as to Nanny's income did not allow respondent to determine with any precision or certainty the amount of the commingled funds which were attributable to Nanny's but which Nanny's no longer retained (i.e., were spent by petitioners on personal items). Whereas Mr. Mason performed a calculation under which he was assured as to the amount of any loan between petitioners and Nanny's on account of the commingled funds, we do not have the same level of assurance in that calculation to hold respondent to it. Third, respondent performed the net worth calculations only after analyzing petitioners' lifestyle and determining that their lifestyle did not appear to comport with their reported income. In this regard, respondent had received the STRs which the Bank had issued as to petitioners reporting that they had entered into various "suspicious" cash transactions. Under the facts herein, we conclude that respondent was entitled to use the net worth method to compute petitioners' income for each subject year.

Petitioners argue alternatively that respondent's net worth analysis was unreliable. They assert that respondent failed to determine accurately their net worth on December 31, 1986, because, they claim, respondent incorrectly determined that they had no cash on hand on that date. They also assert that respondent's net worth analysis failed to reflect properly certain incidental items.

We disagree with petitioners' claim that respondent's net worth analysis is unreliable. We have set forth that analysis in our findings of fact. On the basis of our review of it in light of the record, we are unpersuaded that respondent's calculation as to petitioners' cash on hand on December 31, 1986, is inaccurate. The record contains no reliable evidence from which we can conclude that petitioners, in their personal capacity, had any cash on that date.[5] Petitioners' position as to their cash on hand rests almost entirely on their trial testimony. We find that testimony unpersuasive in that it is uncorroborated, inconsistent, and self-serving. See Roberts v. Commissioner, T.C. Memo. 1987-182. Nor can we conclude that respondent did not properly take into account various other incidental items for

---

[5] Petitioners focus on a $63,000 loan that petitioners received on Aug. 22, 1986, and assert that $21,000 of those proceeds was on hand on Dec. 31, 1986. The record does not support this assertion.

which petitioners claim error in connection with the net worth analysis.

Respondent determined that all of the underpayments attributable to Nanny's were includable in petitioners' gross income as constructive dividends. We disagree. Absent a provision to the contrary, funds which a shareholder diverts from a corporation are generally includable in the shareholder's gross income under section 61(a) to the extent that the shareholder has dominion and control over them. See also Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). One example of a contrary provision is section 301, where Congress has provided that funds (or any other property) distributed by a corporation to a shareholder over which the shareholder has dominion and control are to be taxed under the provisions of section 301(c). Under section 301(c), a constructive distribution is taxable to the shareholder as a dividend only to the extent of the corporation's earnings and profits. Any excess is a nontaxable return of capital to the extent of the shareholder's basis in the corporation, and any remaining amount is taxable to the shareholder as a long-term capital gain. Sec. 301(c)(2) and (3); Truesdell v. Commissioner, 89 T.C. 1280, 1295-1298 (1987). See also FDIC v. First Heights Bank, FSB, 229 F.3d 528, 540 (6th Cir. 2000), wherein the Court of Appeals for the Sixth Circuit, the court to which this case is appealable, stated:

The amount of the constructive dividend given by *
* * [a corporation] must be controlled by the
well-known rule that dividends cannot exceed retained
earnings and profits.  In Hagaman, 958 F.2d at 694, we
stated that "[b]ecause dividends can only be
distributed to the extent of a corporation's earnings
and profits under IRC § 316, a court can only find a
constructive dividend to be taxable as ordinary income
to the extent of the corporation's earnings and
profits."  Another opinion recognizes that
"[o]therwise, a distribution to the stockholder is
merely a recovery from his basis in his shares to the
extent that he has such a basis; to the extent that the
payments exceed the basis, the payments amount to a
[taxable capital] gain."  Estate of DeNiro v.
Commissioner, 746 F.2d 327, 332 (6th Cir. 1984). * * *

See generally Action on Decision on Truesdell v. Commissioner,
supra, CC-1988-025 (Sept. 12, 1988), wherein the Commissioner
stated:

Funds diverted to the shareholder of a wholly owned
corporation should be regarded as constructive
distributions, unless the funds were additional salary
or otherwise were received in a nonshareholder
capacity.  The funds should be included in the income
of the corporation and taxed to the shareholder in
accordance with I.R.C. section 301(c).  When such funds
are received in a shareholder capacity, we will no
longer argue they are ordinary income regardless of
earnings and profits.

Here, we find that Nanny's was incorporated in 1986 and that
it realized taxable income in 1986, 1987, 1988, and 1989 of
$2,436, $18,659, $31,529, and $48,006, respectively.  We also
find that its retained earnings at the end of each of the first 3
respective years (before consideration of this report) were
$2,070, $18,077, and $32,306.  Although a corporation's retained
earnings are not always the same as its earnings and profits, we

are comfortable in treating the two as the same for purposes of the instant case.  See Jones v. Commissioner, T.C. Memo. 1997-400, affd. without published opinion 177 F.3d 983 (11th Cir. 1999).

Respondent asserts that petitioners' understatements for the subject years are attributable to Nanny's to the extent of $29,213, $40,670, and $37,712, respectively.  We agree.  We disagree with respondent, however, that all of these amounts are constructive dividends which are includable in petitioners' gross income as ordinary income.  As to 1987, we conclude and hold that $18,659 (i.e., Nanny's 1987 income) of the $29,213 is includable in petitioners' gross income as a dividend, that $10,000 is excludable from their gross income as a return of capital, and that $554 is includable in their gross income as a long-term capital gain.[6]  Sec. 301(c).  As to 1988, we conclude and hold that $31,529 (i.e., Nanny's 1988 income) of the $40,670 is includable in their gross income as a dividend and that the remainder of $9,141 is includable in their gross income as a long-term capital gain.  Id.  As to 1989, we conclude and hold

---

[6] After considering our opinion herein, we find that at the end of Nanny's 1987 taxable year:  (1) Nanny's had a $582 deficit in earnings and profit (the $18,077 less the constructive dividend of $18,659) and (2) petitioners had a zero basis in their Nanny's stock (their original $10,000 basis less the $10,000 return of capital).

that the entire $37,712 is includable in their gross income as a capital gain. Sec. 1368(b).

Turning to respondent's other determination, namely, that petitioners are liable for fraud, respondent must prove this determination by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1113 (1983). Fraud requires a showing that the taxpayer intended to evade a tax known or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968). Respondent must prove that: (1) Petitioners underpaid their taxes for the relevant years, and (2) some part of each underpayment was due to fraud. Because respondent bears the burden of proving fraud, we may not and shall not bootstrap any part of our fraud determination upon petitioners' failure to prove respondent's deficiency determination erroneous. Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

On the basis of on our review of the record, we conclude that respondent has proven the first prong of the two-part test. Petitioners amended their personal income tax returns for each of the subject years to report additional income. Petitioners' amended returns are admissions of Federal income tax underpayments. Badaracco v. Commissioner, 464 U.S. 386, 399

(1984). Thus, respondent has proven that petitioners underpaid their Federal income taxes for each of the subject years.

As to the second prong of the test; i.e., the presence of fraud, the existence of fraud is a question of fact. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed or imputed; it must be established by independent evidence that establishes a fraudulent intent on the taxpayer's part. Otsuki v. Commissioner, 53 T.C. 96 (1969). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492 (1943); Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Where fraud is determined for multiple years, as is the case here, respondent must establish the requisite fraudulent intent for each of those years in order to prevail as to all of those years. The Court may sustain respondent's determination of fraud only as to those years for which the fraudulent intent is established clearly and convincingly.

We often rely on certain indicia of fraud in deciding the existence of fraud. The presence of several indicia is persuasive circumstantial evidence of fraud. Beaver v. Commissioner, 55 T.C. 85, 93 (1970). The "badges of fraud" include: (1) Filing of false documents, (2) understatement of

income, (2) maintenance of inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, (5) failure to cooperate with tax authorities, (6) engaging in an illegal activity, (7) attempting to conceal the illegal activity, and (8) dealing in cash. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).

Respondent's determination rests primarily on the fact that the Bank issued to him the STRs as to petitioners, that petitioners used cashier's checks to pay for personal expenses, and that petitioners structured their affairs to avoid the reporting requirements as to cash transactions over $10,000. See 31 U.S.C. sec. 5313; 31 C.F.R. sec. 103.22 (2000). Respondent also finds a fraudulent intent on the part of petitioners in the fact that they underreported their income for each subject year, that Nanny's kept inadequate records, and that Nanny's did not deposit all of its cash receipts into the business account.

On the basis of our review of the record, we conclude that respondent has not proven this prong of the two-part test for any of the subject years. First, we give little weight to the mere fact that petitioners' income was understated for each year. As we view the record, bearing in mind the fact that respondent must prove fraud by clear and convincing evidence, we conclude that petitioners' understatements were more properly attributable to

negligence (i.e., an unreasonable failure to comply with the provisions of the Code or a careless, reckless, or intentional disregard of rules or regulations) rather than to fraud (i.e., an intent to evade a tax known or believed to be owing).[7] To be sure, petitioners deposited into their bank accounts all of the unreported income attributable to their rental properties and never attempted to hide their receipt of that income. Moreover, as even respondent acknowledges, petitioners' failure to report all of their rental income on their original returns was due to the fact that they estimated that income rather than attempted earnestly to ascertain it by reference to the bank statements.

As to the fact that petitioners commingled their personal funds with the funds of Nanny's, we do not view this fact in light of the record as a whole as establishing the requisite fraudulent intent. Petitioners' commingling of the funds was simply a continuance of that practice from the immediate prior 4 years in which they operated Nanny's as a sole-proprietorship, rather than as a blatant attempt to avoid Federal income taxes. Moreover, at the end of the relevant years, Mr. Mason, their longtime accountant who was knowledgeable as to both Nanny's

---

[7] We stop short of opining on whether petitioners' underpayment is actually attributable to negligence for purposes of the additions to tax under sec. 6653(a). Respondent has neither determined nor pleaded as an alternative to the fraud determination that petitioners are liable for those additions for any of the subject years.

business and petitioners' commingling of the funds, calculated for Federal income tax purposes the amount of any loan that he believed existed between petitioners and Nanny's by virtue of their use of its funds and vice versa. We are unable to conclude on the basis of the record at hand that petitioners knew when they filed their tax returns that Mr. Mason's calculation may have reflected inaccurately their use of Nanny's funds. Nor do we believe that the mere fact that petitioners commingled their personal funds with the funds of Nanny's, and knew that they did so, means ipso facto that petitioners possessed the requisite fraudulent intent when they filed their income tax returns.

Our conclusion is unchanged by the fact that the Bank issued the STRs as to petitioners. As we view the transactions underlying the STRs, we are unable to conclude that those transactions, which occurred in only the last 2 years in issue, lead to a finding that petitioners possessed the requisite fraudulent intent in any of the years. Ten of the reported transactions involved payments on loans which presumably included the Social Security number of one or both petitioners. The remaining transactions concerned petitioners' purchase of cashier's checks, no two of which were on the same day and each of which was somewhat spread out from another. Although all of the cashier's checks were in amounts less than $10,000, none of those checks, but for three of the $9,000 checks payable to Mr.

Bernard and the four checks payable to the contractor for its $32,940 of services, covered an expense greater than $10,000.[8] Under the facts herein, petitioners' use of the cashier's checks does not convince us that they used those checks with the requisite intent to evade Federal income tax. To be sure, an individual's use of cashier's checks to pay personal expenses does not necessarily mean that the individual did so to evade the payment of Federal income tax. Such is especially true here where petitioners regularly used cashier's checks to pay personal expenses during years before the subject years.

Respondent also finds a fraudulent intent on the part of petitioners in the fact that Nanny's kept imperfect records and that Nanny's did not deposit all of its cash receipts into the business account. We do not do likewise. Nanny's is an entity separate from petitioners, and we do not consider it appropriate under the facts herein to impute Nanny's actions to petitioners. See, e.g., Estate of Feinsmith v. Commissioner, T.C. Memo. 2001-194. In fact, respondent's only exception is to the fact that Nanny's failed to deposit all of its gross receipts into its business account, acknowledging explicitly that petitioners did deposit in their bank accounts all of the income that they

_____

[8] We also bear in mind that petitioners, on Sept. 18, 1989, knowingly subjected themselves to the Bank's practice of reporting cash transactions totaling more than $10,000 when they purchased one of the checks payable to the contractor and made their cash payment on the third loan.

received from their rental properties.  Moreover, as to Nanny's'
1988 taxable year, respondent determined that Nanny's accurately
reported all of its income for that year.  Such a determination
obviously undercuts respondent's position in this case that
petitioners:  (1) Skimmed $40,670 of Nanny's 1988 receipts for
their personal use without reporting those receipts for Federal
income tax purposes and (2) tried to conceal Nanny's earning of
those receipts by dealing in cash and destroying the cash
register tapes.  Respondent tries to downplay the fact that the
audit of Nanny's 1988 taxable year concluded that Nanny's income
was reported correctly on its Federal income tax return.  As we
understand respondent's position as to this fact, Revenue Agent
Smith reached this conclusion only because Nanny's did not supply
him with any document that would disprove the reported amount.
We are unpersuaded that this is so.  In addition to the fact that
Revenue Agent Smith testified to the contrary, we find it
unlikely given the facts herein that respondent would have
conceded that Nanny's income was reported correctly simply
because Nanny's kept in its records no documentation that showed
otherwise.

Nor do we reach a finding of fraud on the basis of our
review of the remaining badges of fraud.  Petitioners did not
attempt to conceal any assets.  They did not engage in an illegal
activity.  They did not attempt to conceal an illegal activity.

They did not deal primarily in cash in their personal capacity; e.g., all of the rent that they received was paid by check. They cooperated with respondent as to their audit; e.g., they promptly gave Revenue Agent Smith their amended returns reporting additional income for those years and expeditiously transferred to respondent all of the records which they maintained as to themselves individually. Although we agree with respondent that petitioners were less than upfront with the State of Michigan in 1988 as to the purchase price of the Tollycraft, and in this regard filed a false document with the State, this fact does not convince us clearly that petitioners possessed the requisite fraudulent intent for that year as to their Federal income tax liability.[9]

All of the parties' arguments have been considered, and we have rejected those arguments not discussed herein as meritless. Accordingly,

Decision will be entered

under Rule 155.

---

[9] Nor do we believe that some of petitioners' explanations as to their behavior, explanations which we find implausible or inconsistent, dictate a finding of fraud in any of the years.